James P. Haynes v. Commissioner. James P. Haynes and Agnes Rae Haynes, v. Commissioner.
Haynes v. Commissioner
Docket Nos. 62082, 62083, 69424.
United States Tax Court
T.C. Memo 1960-221; 1960 Tax Ct. Memo LEXIS 71; 19 T.C.M. (CCH) 1232; T.C.M. (RIA) 60221; October 14, 1960
Lee S. Jones, Esq., Kentucky Home Life Building, Louisville, Ky., for the petitioners. Arthur Clark, Jr., Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined the following deficiencies in income tax and additions to such tax: Addition to Tax under Section [1]
Docket
Number
Year
Deficiency
293(b)
294(d)(1)(A)
294(d)(2)
62082
1943
$1,182.57 *
$ 591.29
$ 0.00
$ 0.00
1944
526.29
263.15
0.00
0.00
1945
1,557.88
778.94
0.00
20.53
1946
2,634.78
1,317.39
156.98
***
1947
4,632.85
2,316.43
360.99
***
62083
1948
2,015.52
1,007.76
103.07
***
1949
923.90
652.58
37.76
***
69424
1951
122.40 **
61.20
0.00
0.00
1952
133.21 **
66.60
0.00
0.00
1954
156.00
78.00 [2]
121.40
***
*72 The principal issue for our determination is whether there are deficiencies due to fraud with intent to evade tax. Dependent on this issue is the question whether all the years involved except 1954 are barred by the statute of limitations or are kept open by reason of the filing of false or fraudulent returns. The year 1954 is not affected by the statute of limitations. As to that year there are the further questions: (1) Whether petitioner is entitled to a claimed dependency *73 exemption; (2) whether petitioner's failure to file a declaration of estimated tax was due to reasonable cause. Since limitations is a bar to all years but 1954, absent fraud, we shall first decide that issue. [3] The facts are presented as they bear on that question. Findings of Fact Some of the facts have been stipulated and are so found. To the extent not included below they are incorporated herein by reference. Petitioners James P. Haynes and Agnes Rae Haynes are husband and wife, residing in Louisville, Kentucky. For the taxable years 1943 through 1947, petitioner James P. Haynes filed individual income tax returns with the collector of internal revenue for the district of Kentucky. For the years 1948, 1949, 1951, 1952 and 1954, the petitioners filed joint returns with the collector of internal revenue for the district of Kentucky. Inasmuch as petitioner Agnes Rae *74 Haynes is a party to this case solely by reason of her having joined in the filing of joint returns for the years 1948, 1949, 1951, 1952 and 1954, references hereinafter made to petitioner shall apply to James P. Haynes only. During all the years involved petitioner was employed by the Louisville Board of Trade (later the Louisville Chamber of Commerce) in connection with its dealings with the transportation industry. He also operated a farm, on a partnership basis with A. B. King until December 1944 and as a sole proprietor thereafter. Petitioner's Books and Records Petitioner kept typewritten income and expense journals in which he recorded receipts of farm income and expenditures for farm items as they arose. The receipts journal also indicated the division of receipts between and among petitioner, his partner (in 1943 and part of 1944) and his tenants. The tenants received exactly one-half of the receipts on most crops. Petitioner also prepared handwritten work sheets at the end of each year on which he purported to summarize the cash payments of all types (farm and personal) made by him during the year, but these work sheets were not accurate and indicate a lack of care *75 in preparation. The journals and work sheets were then turned over to a certified public accountant who prepared all of petitioner's returns and on whom petitioner relied for classification of items as between expense and capital and depreciation terms as to items which were capitalized. The record does not reveal that petitioner in any way examined the accountant's figures after the returns were prepared. Respondent's Method of Reconstruction In determining petitioner's gross income for the years 1943 through 1949 [4] respondent's Agent Long used the so-called bank deposits method. First, he classified the deposits according to source, taking the labels from petitioner's check stubs to the extent the stubs indicated the source. Several items not identified on the stubs he classified simply as "Other" or "Dividends and other items." To these figures he added the amount of certain expenditures for which there were no canceled checks and treated them as "Items received but not deposited," and in this way purported to determine petitioner's taxable gross receipts; however, some of petitioner's canceled checks were missing and unavailable to Long. *76 Respondent determined the tenant's shares by simply totaling the canceled checks clearly marked as so payable to such tenants in each year. These amounts were "eliminated" from gross receipts. By this method respondent determined the tenants' shares for the 7-year period to be $26,382.76, whereas petitioner's journals showed these to total $46,232.38. In pursuing the above method of reconstruction, Long failed to take into account that at least the following borrowed amounts were not deposited: Lender
Union
Lincoln Bank
Central Life
Year
Total
Nolin Production
and Trust
Insurance Co.
1943
$ 0.00
$ 0.00
$ 0.00
$ 0.00
1944
800.00
0.00
800.00
0.00
1945
17,157.50
2,157.50
15,000.00
0.00
1946
2,138.72
2,138.72
0.00
0.00
1947
3,235.76
0.00
0.00
3,235.76
1948
1,128.61
0.00
0.00
1,128.61
1949
2,311.60
0.00
0.00
2,311.60
$26,772.19
In 1946 petitioner paid K & W Transfer Line for certain work by giving his personal note. The amount of the bill, $577, was added to petitioner's deposits by Long. In 1948 petitioner gave Clarence Hurst a note in the amount of $377.50 in discharge of an obligation. *77 Respondent now concedes that this was incorrectly added to deposits. For each year the agent added back to petitioner's salary deposits the various amounts withheld from salary. These add-backs are not challenged and they merely bring the salary up to the amount reported in each year except 1948 where they produce an amount which is $268.74 less than petitioner reported. Petitioner also omitted $304 in commissions for 1943 as determined by respondent. Farm Receipts There follows a comparison of the agent's schedule of deposited farm receipts with the gross farm receipts shown by petitioner's journals: Gross Sales of Farm Products
(Other Than Tobacco)
Per Petitioner's
Year
Per Deposits
Journals
1943
$ 540.59
$ 650.15 *
1944
2,786.87
3,137.99 *
1945
7,006.36
7,554.00
1946
11,626.28
12,472.16
1947
12,918.18
14,612.06
1948
11,423.93
13,527.78
1949
17,906.68
14,159.79
Total
$64,208.89
$66,113.93
Gross Tobacco Sales *
Per Petitioner's
Books (Adjusted
Year
Per Deposits
to Year of Sale)
1943
$ 0.00
$ 0.00
1944
1,938.35
1,902.17
1945
3,338.50
6,677.00 **
1946
1,220.73
2,441.47
1947
8,088.60
9,233.90
1948
6,088.65
8,465.04
1949
1,243.97
3,425.76
Total
$21,918.80
$32,145.34
*78 Subtracting from each party's figures the alleged amount of tenants' shares, but before considering the increases made by petitioner's returns, the following comparison results: Per
Per
Petitioner's
Agent
Journals
Gross receipts 1943-1949
$86,127.69
$98,259.27
Less: Tenants' shares
26,382.76
46,232.38
Net receipts
$59,744.93
$52,026.89
Comparison of petitioner's net receipts as shown above with his reported receipts on his returns follows: Tobacco Sales
Per Books *
(After Ten-
Per
Return Over
Year
ants' Shares)
Return
(Under)
1943
$ 0.00
$ 0.00
$ 0.00
1944
951.09
3,804.34
2,853.25
1945
3,338.50
1,430.62
(1,907.88)
1946
1,220.73
2,441.47
1,220.74
1947
4,616.95
4,616.95
0.00
1948
4,232.52
2,650.25
[1] (1,582.27)
1949
1,712.88
1,712.88
0.00
Total
$16,072.67
$16,656.51
$ 583.84
*79 Sales of Farm Products
(Other Than Tobacco)
Per Books (After Tenants'
Per
Return Over
Year
Shares)
Return
(Under)
1943
$ 866.86 +
$ 866.86
$ 0.00
1944
1,660.95
3,060.28
1,399.33
1945
5,467.90
4,511.86
(956.04) n[*] 1946
6,989.70 *
7,079.61
89.91
1947
7,537.77
7,577.37
39.60
1948
6,474.21 **
6,706.61
232.40
1949
6,956.83
7,122.20 ***
165.37 ****
Total
$35,954.22
$36,924.79
$ 970.57
*80 Farm Expenditures The agent made his analysis principally from petitioner's canceled checks. In only a few instances did he consider other evidence of expenditures which he found in petitioner's journals. He first coded all expenditures according to categories which he deemed appropriate and then summarized the classes of expenditures, using the basic categories - capital expenditures, farm expenses and personal items. There is no indication of which particular claimed farm expenses (apart from interest deductions) the agent disallowed under this method. Nor is it indicated whether this disallowance was due to the classification of certain deducted items as personal. A comparison of the expenditures claimed and those allowed by the agent follows: Per Agent
Capital
Farm Expenses
Expend-
(not including
Year
itures *
depreciation)
Total
1943
$ 2,487.53
$ 1,700.57
$ 4,188.10
1944
11,235.46
4,163.95
15,399.41
1945
16,108.52
6,333.05
22,441.57
1946
9,374.13
4,267.37
13,641.50
1947
3,400.84
b 5,025.53
8,426.37
1948
4,367.20
5,141.54
9,508.74
1949
1,977.36
c 7,472.92
9,450.28
Total
$48,951.04
$34,104.93
$83,055.97
*81 Per Returns
Farm Expenses
Capital
(not including
Expend-
Year
Total
depreciation)
itures *
1943
$ 3,950.82
$ 1,590.82 a
$ 2,360.00
1944
9,767.05
5,831.21
3,935.84
1945
25,105.03
5,931.61
19,173.42
1946
15,979.40
10,783.96
5,195.44
1947
b
8,194.86
1,785.59
9,980.45
1948
10,016.48
8,281.65
1,734.83
1949
12,079.27
10,177.47
1,901.80
Total
$86,878.50
$50,791.58
$36,086.92
Interest (Farm and Personal) A large portion of the deficiencies determined arises from the alleged overstatement of interest deductions. The agent did not allow these when money was borrowed on a discount basis, although the petitioner did some borrowing in this fashion. Furthermore, the agent did not *82 allow interest deductions when loans were paid off except in so far as the canceled checks clearly demonstrated the interest element. For the year 1949 there is no showing at all as to how respondent arrived at the allowable interest deduction. On the item of interest petitioner's work sheets compare with his total claimed deductions and those allowed by the agent as is shown below: Interest Deductions
Farm
Nonbusiness
Petitioner's
Per
Per
Per
Per
Work Sheet
Year
Agent
Return
Agent
Return
Total
1943
$ 502.04
$ 332.27
$ 167.34
$ 1,039.76
$ 1,372.03
1944
976.86
311.95
216.74
1,220.04
1,531.99
1945
1,073.03
349.47
576.64
1,532.00
1,761.47
1946
676.69
863.85
221.71
1,375.06
1,877.59
1947
1,203.00
909.30
222.50
1,809.70
2,719.00
1948
116.01
580.44
452.27 *
1,170.75
1,751.19
1949
875.54
1,323.31
89.50 *
2,803.83 **
2,587.10
$5,423.17
$4,670.59
$1,946.70
$10,951.14
$13,600.37
*83 The petitioner, in addition to borrowing from the sources already mentioned, had borrowings from many other sources, including the Mount Washington (Kentucky) Bank and the First National Bank. The agent admittedly made no effort to verify the claimed interest deductions beyond his canceled checks method. By his method the agent determined as loans repaid (exclusive of interest) and credited petitioner with having received a net amount of loans as follows: Loans
Proceeds of
Year
Repaid
Loans Received
1943
$ 2,269.37
$ 3,343.48
1944
17,894.19
21,045.95
1945
17,487.99
32,943.00
1946
7,510.75
10,354.14
1947
63,676.02
47,216.81
1948
43,867.33
23,732.00
1949
16,861.80
7,986.02
Total
$169,567.45
$146,621.40
The record is silent as to the opening or closing balances due on any of the above loans other than the following: Lincoln
Union
Nolin
Bank
Central
Date Due
Total
Production
and Trust
Life Ins. Co.
1/1/43
$ 6,672.76
$0
$0
$ 6,672.76
12/31/49
16,613.45
2,042.64
4,350.00
10,220.81
Increased Borrowing 1943-1949
$ 9,940.69
$2,042.64
$4,350.00
$ 3,548.05
Traveling Expense and *84 Reimbursement On this issue deficiencies and additions for fraud are asserted for the years 1951 and 1952 as well as the 1943-1949 period. The claimed amounts of travel expenses and the amounts of reimbursements to petitioner by the Board of Trade for his travel expenses connected with that employment are as follows: Travel Expense
Reimbursed
Year
Deducted
By Employer
1943
$ 787.09
$ 995.58
1944
481.60
1,367.44
1945
569.13
1,539.76
1946
0.00 *
1,607.90
1947
884.91
2,110.12
1948
835.18
1,553.76
1949
860.54
2,976.88
1951
657.70
1,865.11
1952
228.40
1,993.39
$5,304.55
$16,009.94
The respondent does not question the validity of the travel deductions themselves but claims that they are included in the amount reimbursed. Respondent introduced no clear evidence as to the nature of petitioner's agreement with his employer as regards travel expense. Petitioner incurred certain expenses in traveling to a school in Chicago and in representing local businessmen before the Interstate Commerce Commission and other Federal agencies *85 concerned with the transportation industry in Washington, D.C., and before various state agencies in Kentucky and Indiana. The record fails to show that the reimbursement covered any of these amounts or what activity the claimed travel expenses did cover. Other Income In 1943-1949 petitioner received $1,572.60 each year in the form of an annuity. The portion of each annuity excludable as a recovery of cost was $979.32. Thus, for the year 1943 petitioner should have included $593.28 but, in fact, included $594. For the years 1944 to 1949 petitioner should have included $593.28 each year. He did include exactly that amount in the years 1944 and 1945. For the year 1946 petitioner included nothing in gross income from annuities. For the years 1947-1949 petitioner included $561.96 each year, or $31.32 less than the proper amount. For the entire 7-year period petitioner omitted $686.52 which should have been included. The schedule below compares the amounts of other income (except for annuities) computed by the agent under his described bank deposits method with the amounts reported by petitioner: Other Income
Omission Clearly
Per
Apparent
Not Proven
Year
Reported
Deposits
Omission
on Fraud Issue
Balance
1943
$ 53.92
$ 452.91
$ 398.99
0
$398.99
1944
100.19
123.28
23.09
0
23.09
1945
100.19
764.87
664.68
711.07 [1]
(46.39)
1946
105.05
0
(105.05)
0
(105.05)
1947
197.75
2,433.31
2,235.56
2,176.73 [1]
58.83
1948
0
153.18
153.18
98.75 [2]
54.43
1949
0
468.62
468.62
362.50 [3]
106.12
Total
$557.10
$4,396.17
$3,839.07
$3,349.05
$490.02
*86 Dependency Exemptions For the years 1943-1945, the petitioner claimed his sister, Marietta Haynes King, as a dependent. During these years she was living with her husband. Petitioner disbursed $163.70, $296.91, and $220.52 directly to her for the years in question. The only other evidence relating to this claim is the insertion of the following remark in the personal exemption schedule for 1943: "Widower - maintain home for aged aunt & sister." [5]
*87 The petitioner claimed his mother's sister, Effie Jesse (hereinafter referred to as "Aunt Effie"), as a dependent for all the years in question. In his 1943 return he made the above-mentioned remark in regard to Aunt Effie. For the other 9 years petitioner's answers to the following queries in the returns were: Did
Did You
Dependent
Furnish
Address If
Reside in
Entire
Different
Year
Your Home?
Support?
from Yours
1944-1947 *
x
x
x
1948-1949 *
x
x
xx
1951
Yes
Yes
xx
1952
xx
Yes
xx
1954
x
x
xx
Aunt Effie resided at a rest home in Louisville commencing in 1940 and during all the years in question. The home was for destitute people and it furnished their room, food and certain medical expenses. Petitioner had been contributing to her support since 1927 and prior to her entrance into the home had given her approximately $50 per month (in small amounts) in cash and wearing apparel. She also stayed at *88 his home on an "in-and-out" basis prior to 1940. The respondent concedes that there were checks given to Aunt Effie in the following amounts: Year
Amount
1943
$105.00
1944
127.50
1945
120.00
1946
112.00
1947
165.00
1948
95.00
1949
79.14
Petitioner also gave her wearing apparel and irregular amounts of cash in these years approximating $30 per month in total, and in 1949 purchased a grave-marker for her at a cost of $320. During the years in issue, petitioner made contributions of unknown amounts to the support of other relatives, not claimed as dependents. No part of any deficiency was due to fraud with intent to evade tax. Opinion Issue 1. Fraud (1943-1949, 1951, 1952, 1954). Bank Deposits and Canceled Checks Method Preliminarily, it should be noted that, even assuming petitioner's books to be internally consistent and clear, respondent nevertheless acted properly in resorting to a method divorced from such books to determine whether they accurately reflected income. Holland v. United States, 348 U.S. 121 (1954). Petitioner has done little to dispute the correctness of the deficiencies determined by respondent and so, if *89 the question involved were simply the validity of the proposed assessments, this case might be disposed of quite easily. However, in order to sustain the determination of fraud the respondent has the burden to establish, by clear and convincing evidence, a fraudulent intent on petitioner's part. M. Rea Gano, 19 B.T.A. 518 (1930). The mere proof of a deficiency does not carry respondent's burden in this regard. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955), affirming on this issue a Memorandum Opinion of this Court. We are thus compelled to analyze the specific circumstances in which fraud is here alleged to exist. The separate items included in our findings are the only ones on which the alleged fraud is based. The books contained no erasures, alterations or false entries. Nor was there any concealment of income. Respondent's agent made no effort to go beyond his described bank deposits and canceled checks method to ascertain the validity of petitioner's books and returns. Respondent's assertion of fraud (apart from the dependency exemption questions) rests solely on the basis of comparison of totals rather than on any specific items. Comparing *90 these totals we find: Net
Income Per
Net Income
Alleged
Deficiency
Returned by
Under-
Year
Notice
Petitioner
statement
1943
$ 7,333.83
$ 4,197.02
$ 3,136.81 *
1944
4,828.00
3,655.33
1,172.67
1945
7,109.23
1,605.74
5,503.49
1946
11,350.08
580.24
10,769.84
1947
17,160.02
3,515.15
13,644.87
1948
11,752.01
1,840.91
9,911.10
1949
8,511.82
(173.39)
8,685.21
Totals
$68,044.99
$15,221.00
$52,823.99
These differences must be viewed in light of the circumstances discussed in the categories below which largely explain the apparent discrepancy. Turning first to petitioner's reported gross farm receipts it is apparent from the comparison set forth in our findings that the bank deposits method itself not only fails to reveal any omissions but, to the contrary, shows overstatements. Thus, respondent's case in this regard can be established only by resorting to his canceled checks method for determining the amount paid to petitioner's tenants. Respondent's computations rest on the assumption that all such amounts were paid *91 by canceled checks. The weakness in this assumption is threefold: (1) Some canceled checks were admittedly missing; (2) some part of tenants' shares may have been taken in kind, by a division of crops; and (3) much of petitioner's borrowings was not deposited but was nevertheless available to make expenditures, e.g., to tenants. [6] Petitioner may well have paid some of these tenants by cash. Even assuming that respondent's determination of the tenants' shares is correct, the comparisons reveal that the returned income over the 7-year period still exceeded the amount determined by respondent: Summary Comparison of Farm Receipts
Net receipts per books
$52,026.89
Add: Receipts returned for tax not reflected
in books: Tobacco
$ 583.84
Livestock
7,576.66
Other farm products
970.57
9,131.07
Net receipts reported
$61,157.96
Receipts per agent
$59,744.93
Furthermore, on the fraud issue, we feel that several of petitioner's income omissions were patently *92 careless or inadvertent: (1) The $6.04 received on sale of corn in 1945 was an isolated item and so trivial that it could well have been overlooked innocently. (2) The circumstances surrounding the omission of $950 on the sale of beef cows in the same year demonstrate to us that petitioner fully disclosed the receipt but simply neglected to carry the item (reported on a separate part of the schedule) over to the summary. This does not even approach a fraudulent omission. (3) The $1,582.27 omitted from 1948 tobacco sales represents three items received in January 1948, which total exactly that amount. Petitioner might well have believed (incorrectly, but honestly) that such items had been included by his accountant in 1947. Or he might simply have believed, from glancing through his records, that the 1948 sales as reported were correct, there being no glaring disparity in totals. (4) The omission of $412.47 in sales in 1949 resulted from a confusion between sales and purchases. This error again is much more apt to have arisen through carelessness than through a deliberate omission. Nor is there anything in these four omissions taken collectively which suggests any pattern *93 or scheme of deliberate concealment of receipts. Cf. M. Rea Gano, supra. Taking these items into account, we may summarize the difference between the agent's determination and petitioner's report of farm receipts as follows: Net receipts reported
$61,157.96
Add: Careless omissions
1945
$ 956.04
1948
1,582.27
1949
412.47
2,950.78
Receipts reported or carelessly omitted
$64,108.74
Receipts per agent
$59,744.93
Hence, we cannot find any understatement of farm receipts unless we also add back respondent's determination over the 7-year period of farm "Items received but not deposited," totaling $6,078.32. Implicit in this determination is the assumption that expenditures for which he could find no canceled checks must have been made from taxable gross receipts which simply by-passed the bank. Just as we could not, on the fraud issue, sustain respondent's method of determining tenants' shares, for similar reasons we cannot uphold his determination of these items, for obviously, many of the discharged obligations could have been paid in cash from borrowings, rather than by check, and we know, from the record, that at least one *94 such item in the amount of $577 (K & W Transfer Line) was paid by the giving of a note. Furthermore, where a taxpayer has also made many personal withdrawals it is erroneous to assume that cash purchases could not have been made from such source. United States v. Caserta, 199 F. 2d 905 (C.A. 3, 1952). Also, respondent has not shown petitioner's opening or closing bank balances and thus we cannot assume that these added back amounts were not drawn from funds in existence prior to the first year in issue. Dupree v. United States, 218 F.2d 781 (C.A. 5, 1955), rehearing denied 220 F. 2d 748. Accordingly, we hold that there is no fraud in reporting farm receipts. On the question of farm expenses, we first note, that most of the apparent discrepancy arises from the capitalization of items which petitioner had charged to expense. Inasmuch as many of these charges were questions of judgment and considering the fact that the classifications were made by the certified public accountant, without any knowledge on petitioner's part, we cannot say that these classifications, even if improper, indicate fraud. There are numerous items of expenditure throughout *95 the years - for example, building supplies - as to which there may have been doubt as to the proper classification. Nor is there the slightest indication in the record that petitioner had any learning or experience in this field. Petitioner's farm expense journal and his careless personally summarized worksheets bear no relationship either to total expenditures set forth in the return or to those determined by respondent. The agent's own exhibits demonstrate that neither of these two sources is helpful in arriving at petitioner's true total expenditures over the period. Any inference as to fraud must, therefore, be drawn by comparing total farm expenditures set forth on the returns with those found by the agent. Comparing these two figures we find a difference of $3,822.53 over the 7-year period. We have found that at least (1) the $653.85 loss on death of cows in 1947 and (2) the $577.84 purchase of feed in 1949 were omitted from the agent's totals. Thus, the difference is at most $2,590.84. Some of these differences may have been attributable to cash expenditures out of nondeposited funds or to the agent's classification between personal and farm expenses. We must bear in *96 mind that respondent's charges are based not on any one improper deduction but on the comparison of totals. Taking all of this into account and considering that it was the accountant who actually determined the amount of deduction on the returns, we cannot conclude that whatever exaggeration there may have been in the claimed deductions was apparent to the petitioner. Thus we do not feel that this case is comparable to those in which the mere size of the differences suggests knowledge by the taxpayer of overstated deductions (or understated income). Cf. Arlettecoat Co., 14 T.C. 751 (1950). Nor can we discern any pattern of improper deductions which supports the inference that part of the deductions are deliberately fabricated. Cf. M. Rea Gano, supra.Nor are there other indicia of fraud. Cf. Jacob C. Ehrlich, 31 T.C. 536 (1958) (special bank account; open loan and exchange account). As to the interest deductions, respondent has proved that petitioner included $1,323.31 in both the farm and personal interest categories for the year 1949, but this is an isolated incident. We do not believe that it supports the charge of fraud. Further, *97 as to interest deductions, the facts reveal several inaccuracies in respondent's calculations. The respondent's determination shows petitioner to have paid $6,114.55 more of principal than the available evidence indicates, as is shown by the following summary: Summary of Loans *
(excluding interest)
1943 through 1949
Proceeds received, per Government
$146,621.40
Plus: Proceeds by-passing bank
26,772.19
Total proceeds borrowed
$173,393.59
Proceeds repaid, per Government
169,567.45
Net increase in loans, per Government
$ 3,826.14
Known increase in loans payable (Nolin, Lincoln and Union
9,940.69
Central)
Difference
$ 6,114.55
Perhaps, this amount was paid against the principal of other loans outstanding prior to 1943 but such a conclusion would be mere suspicion on our part and this cannot sustain a fraud charge. Drieborg v. Commissioner, supra, and this is especially true where, as here, the entire record more nearly supports the conclusion that this amount was paid as interest. The *98 respondent has not satisfactorily demonstrated that all of petitioner's travel expenses were reimbursed. Petitioner may well have incurred traveling expenses beyond those for which he was reimbursed. In each year (except 1951) petitioner's return included a schedule giving itemized details of the expenditures making up the totals. Certainly, there is nothing to suggest that petitioner knew that he was claiming the expenses improperly when he submitted detailed records of the travel expenses to his accountant. There is no evidence at all as to the state of taxpayer's knowledge concerning the proper tax treatment of travel expenses and reimbursement. Our findings indicate that there is nothing which even remotely suggests fraud in the reporting of annuity income or salaries and commissions. On the question of "Other Income," again we cannot sustain the treatment of amounts which respondent added to this category as "Items received but not deposited," totaling $924.06. Most of the other discrepancies in the category of "Other Income" have been shown by our findings not to indicate fraud. The remainder, amounting to $490.02 over a period of 7 years, seems rather inconsequential and *99 respondent has not established that it came from a probable taxable source rather than a plausible nontaxable source. Under Holland v. United States, supra, even where a taxable source is shown, the Government is required to negate any reasonable nontaxable source advanced by the taxpayer before the Court will infer (as respondent requests) that increases were derived from taxable sources. Here the record clearly establishes that petitioner has declared borrowing to be a source and the respondent has done nothing to show that these deposits are not the proceeds of borrowed funds. On the whole we conclude that respondent has not proven fraud in the reporting of "Other Income." In summary, for the 7-year period 1943-1949, we consider the following differences between respondent's and petitioner's figures as completely unproved (by the respondent) on the fraud issue: 1. Alleged understated farm receipts
$11,344.29 [7]
2. Alleged overstated farm de-ductions (exclusive
16,686.65
of depreciation)
3. Alleged improper interest de-ductions: Included
$1,323.31
twice
Treated as payment of principal
6,114.55
7,437.86
4. Alleged overstated travel de-ductions
5,304.55
5. Alleged annuity understatement
686.52
6. Alleged salary understatement
35.26
7. Alleged other income understatement: Apparent omission
$3,839.07
Undeposited (per agent)
924.06
4,763.13
$46,258.26
Total Alleged Understatement
$52,823.99
*100 The difference over the 7-year period is $6,565.73. Considering this difference of less than $1,000 per year, we note that for that same period more than $7,000 in claimed depreciation was disallowed by respondent. A part of this resulted from respondent's refusal to recognize certain depreciable items claimed to have been acquired prior to 1943. The larger portion resulted from differences between the parties regarding the useful lives of various assets, such as farm improvements and dairy herd and other farm animals. Respondent introduced no evidence whatsoever on this question. Thus we find it impossible to conclude that petitioner depreciated improper assets, or depreciated assets over useful lives which he knew to be shorter than those permitted by the tax laws. Our separate analysis *101 of all the above items, considered together with the fact that there were no alterations or erasures by petitioner and no specific instances of fraud (apart from the claimed dependency exemptions) alleged by respondent, leads us to conclude that respondent has not established fraud by clear and convincing evidence. Dependency Exemptions The respondent introduced no evidence concerning the amounts spent by other parties for the support of Marietta Haynes King, petitioner's sister, in the years 1943-1945, nor is there any evidence of record that she and her husband did not in fact live with petitioner. We could assume that they did not but this would not be a proper assumption on such an important facet of the fraud issue. M. Rea Gano, supra.Certainly there is no evidence that petitioner had knowledge of any amounts spent by other parties, or of the statutory requirement that he furnish a given portion of her support or of the definition of support. Accordingly, there is nothing to sustain the charge of fraud by petitioner in claiming her as an exemption in those years. As to Aunt Effie, while petitioner knew of her residence at the rest home there is nothing to *102 show that he knew of the dollar amount of the home's contributions. More important, the record is devoid of any evidence from which we can infer that petitioner knew that such contributions were treated as support. Furthermore, respondent introduced his 1942 audit of petitioner's 1940 return into evidence. It indicates that petitioner had paid a $500 initial support fee for Aunt Effie in that year. We refuse to reason (as respondent appears to urge that we should) that because petitioner was experienced in the ways of the transportation industry ipso facto he understood the intricacies of Federal tax law. It is also to be noted that there is no indication of how much petitioner spent after 1949. Bearing all this in mind we can excuse petitioner's affirmative answer to the inquiry in 1951 and 1952 as to whether he furnished Aunt Effie's entire support. These were the only years in which the question was asked. Furthermore, these statements were inserted in the return originally by the accountant not by petitioner. This may explain, at least in part, the statement on the 1951 return that Aunt Effie "resided" in petitioner's home. Agent Long who examined the 1951 return in 1955 admits *103 having learned much earlier (his first audit started in 1950) of Aunt Effie's residence in the rest home. Another agent testified that at the time of his audit in 1951 (1949 return) petitioner told him of Aunt Effie's residence in a rest home. It is thus difficult to see how these statements on the returns had any misleading tendency. In 1949 yet another revenue agent examined petitioner's 1944 return. His examination appears to have been confined solely to the dependency question. As to verifying petitioner's claim for Aunt Effie, this agent testified as follows: A. He told me she [Aunt Effie] was his support and a few days later I went out to his house to see her and I met two elderly ladies in the house. I forget now what their names were. They were sitting there and I took it for granted they were living with him and I came on back and accepted the report as was filed and sent it in. Petitioner made no statements to this agent regarding Aunt Effie's residence. As to this narrative by agent of his 1949 visit to petitioner's home, we feel that the agent leaped to conclusions rather hastily. There is no evidence that petitioner knew that the agent was going to call on *104 him nor even that petitioner was present when the call was made. Nor is it clear that Aunt Effie was one of the ladies whom the agent saw. The circumstance is at most "suspicious" and will not support an inference that petitioner deliberately arranged for the two old ladies to be present in order to deceive the agent into believing that one of them lived there. In 1951, a third agent examined petitioner's 1949 return. His testimony was even less meaningful than that of the agent who audited the 1944 return. It went as follows on direct examination by respondent: Q. Did you inquire of the Petitioner concerning his contributions toward Mrs. Jesse's support? A. Not too deep. * * *
Q. Did you make any independent inquiry at that time of Parr's Rest Home? A. No, sir, I overlooked that. I thought I was being fair to let him have one dependent, since he was helping other poor relatives. He told me that he did help other people. On cross-examination by petitioner, the agent stated: Q. Did you know that Mrs. Effie Jesse was in Parr's Home then? A. He told me she was. * * * Q. How long had she been there? A. I don't know. Anything further, I thought I would rather close *105 the case than waste a lot of time. * * *
Q. Did he tell you about buying some lamps for her? A. No, sir. Q. Or other items, coats, clothing? A. No, I knew he was good to people or thought he was. I just decided to get the case closed because my record was going down - too many trips, couldn't get anything. This agent's haphazard method of checking on the claim for Aunt Effie reveals only indifference on his part, certainly not a deliberate misrepresentation by petitioner. Both agents permitted petitioner to claim Aunt Effie. After both agents had allowed the deduction, without having been misled by petitioner, petitioner might well have thought the deduction proper. Yet a fourth agent examined petitioner's 1940 [8] return in 1942, questioning, inter alia, a claimed Charitable deduction of $239.63 under section 23(o) for the amounts given to Aunt Effie. The petitioner did not claim Aunt Effie as a dependent that year. For that year petitioner signed a waiver (Form 870), consenting to the assessment of an additional tax. The revenue agent's report attached to the waiver gave the following reason for disallowing the claimed deduction: Contributions to individuals are *106 not within the provisions of Section 23(o) of the Internal Revenue Code, and are unallowable deductions. Since it has not been shown that taxpayer contributes enough support to his aunt to entitle him to the credit for dependency as described in Section 25(b)(2) I.R.C. no such credit is allowed herein. The $239.63 together with unrelated adjustments totaling $1,133.28 was added back to net income, thereby raising petitioner's tax liability from $29.22 to $83.58 and producing a deficiency of $54.36 to which petitioner agreed. The agent had no independent recollection of the audit or of petitioner's participation therein and testified solely on the basis of the report he made at the time of the audit. The 1942 audit has little probative value here. First, the deduction (relating to Aunt Effie) which the agent disallowed was a charitable deduction - the petitioner did not, in the year then under audit, treat Aunt Effie as a dependent. Thus, *107 it is not at all clear that petitioner was aware of the gratuitous indication in the report that she would have been disallowed as a dependent had she been claimed. Secondly, the Total deficiency was only about $55 and but a minor part of that was due to the disallowance of the charitable deduction for amounts paid to or for Aunt Effie. This circumstance makes it impossible for us to conclude that petitioner was specifically aware of his improper treatment of amounts paid to or for Aunt Effie. There is no evidence that Aunt Effie was discussed at the audit. The agent, Long, who prepared the instant case (including the bank deposits and canceled checks summaries) asked petitioner no questions regarding Aunt Effie. Even when we consider the evidence relating to the claiming of dependency exemptions in conjunction with the proof produced by the bank deposits and canceled checks method, we do not feel that respondent has proved fraud by clear and convincing evidence. Our decision on this issue makes the statute of limitations a bar to every year but 1954. Issue 2. Dependency Deduction (1954). Petitioner has introduced no evidence that he furnished over one-half of Aunt Effie's *108 support in 1954 or that she had less than $600 gross income in that year. Accordingly, we sustain respondent in his disallowance of said claim. Issue 3. Section 294(d)(1)(A) Addition. Petitioner introduced no evidence to show that his failure to file an estimate for the year 1954 was due to reasonable cause and not to wilful neglect. Accordingly, we sustain respondent's addition to tax under section 294(d)(1)(A). [9] The fact that petitioner's returns were prepared by a certified public accountant does not constitute sufficient proof that the failure was due to reasonable cause. John T. Potter, 27 T.C. 200 (1956). Decisions will be entered under Rule 50. Footnotes
1. Except where otherwise noted, references are to the Internal Revenue Code of 1939. ↩
*. Includes deficiency in Victory tax. ↩
***. For the years indicated respondent originally proposed additions for substantial underestimation of income taxes under section 294(d)(2). By virtue of the Supreme Court decision in Commissioner v. Acker, 361 U.S. 87↩ (1959), respondent now concedes that such additions are improper where, as here, no declarations of estimated tax were filed. **. By his answer, respondent has sought additional deficiencies by proposing to disallow $962.53 and $534.76 in travel expense for the years 1951 and 1952, respectively. ↩
2. Section 6653(b), I.R.C. of 1954↩.
3. Respondent's determination of fraud is based upon an alleged pattern of successive understatements of income and overstatements of deductions. No false entries, double books, unrevealed sources of income or other specific acts of fraud (save the claiming of dependency exemptions) are alleged or shown.↩
4. For the years 1951 and 1952 the only deficiencies asserted are for alleged improper traveling deductions and a dependency exemption. For 1954 the deficiency arises only from the proposed disallowance of a dependency exemption. The bank deposits method was not used in these last 3 years.↩
*. This is petitioner's share after crediting his partner, A. B. King, with his share.↩
*. Inasmuch as there is considerable evidence that tobacco was grown at the end of one calendar year but sold early in January of the next year (petitioner reported on a calendar year) the tobacco figures are meaningful, on the fraud issue, only over a period of years; consequently, we set out tobacco sales apart from sales of other farm products so that this pattern may be more clearly seen. ↩
**. Petitioner paid King $900 in settlement of his 1944 interest in tobacco but the record fails to reveal how this payment was handled taxwise. The $900 is included in the above figure.↩
*. Adjusted to reflect year of receipt. ↩
1. This difference is due to three specific January 1948 items which were omitted in petitioner's computation of tobacco sales for 1948.↩
+. Includes A. B. King's share. The 1943 return simply reported petitioner's share of the net farm loss reported on Form 1040F. n[*] This discrepancy results from omission of (1) an isolated sale of corn in the amount of $6.04; (2) $950 received on sale of beef cows. This item was appropriately reported in part 4 of page 1 of Form 1040F but the amount was not carried over to its proper place on the summary at the bottom of page 1. a1 The books also show $7,300 received on the sale of timber, but this amount was reported elsewhere on the return in Schedule D. a2 The books also show $910 received as refund on Federal Land Bank stock. This receipt was reported in the 1948 return under "Remarks" at the bottom of page 3, Form 1040F, and there offset by deducting the same amount as "cost." a3 In addition to this figure, the 1949 return also reported receipt of $7,576.66 on sale of dairy cows which was not recorded on the books. The cost of $3,554.07 deducted from these receipts had been capitalized in prior years. a4 This difference results from treating a $577.84 feed purchase as a sale and, in the same transaction, treating sales of $412.47 as purchases. On the return petitioner removed the income item but did not reduce sales by the amount of the expenditure, so the net result was that petitioner showed income of $165.37, whereas he should have showed expenditures of that amount.↩
*. Exclusive of purchases of land. ↩
b. $653.85 of the expenses on the return represents the basis of the farm animals which died during 1947. The canceled checks method could not reflect such an expense. ↩
c. There is a purchase of feed in the amount of $577.84 not included herein. See last note of schedule comparing reported farm income with that shown on books.↩
a. Includes $560 claimed as cost of cattle sold in 1945. ↩
*. Agent allowed the standard deduction instead of a deduction for nonbusiness interest. ↩
**. This figure includes the $1,323.31 of farm interest for a second time. That is, the return included that amount in both categories.↩
*. Respondent's agent conceded that there was at least $143.80 in travel expenses not reimbursed in 1946.↩
1. Total amounts determined by the agent to be the taxable portion of amounts received in 1945 and 1947 on the surrendering of certain life insurance policies. Since there is no indication of record that petitioner knew either the amounts or the proper tax treatment of these items, and the agent testified that he did not consider these omissions to indicate fraud, we treat these amounts as unproved on the fraud issue. ↩
2. This item was simply labeled "Rotary" and classified "other income" by the agent. ↩
3. This was a single deposit item simply labeled "other professional income" by the agent.↩
5. The taxpayer's first wife died in 1937. There is no evidence as to when he married his present wife, Agnes R. Haynes, except that he first claimed her as a dependent in 1945. Thus he apparently was a widower in 1943.↩
*. On the returns, as filed, $394.26 of the deductions claimed in 1945 produced no tax benefit, and in 1946 and 1949 the deduction claimed produced no tax benefit. ↩
x. Question not asked. ↩
xx. Asked but left unanswered.↩
*. Deficiency notice alleges understatement of $3,580.39. The difference of $443.58 is unexplained.↩
6. Over the 7-year period, 1943-1949, respondent disallowed a total of $19,849.62 claimed tenants' shares, but during this same period petitioner borrowed $26,772.19 which was not deposited.↩
*. Assuming loan balances, other than Nolin, Lincoln and Union Central, were the same at the beginning and end of the 1943-1949 period.↩
7. ↩
Undeposited farm receipts (per agent)
$ 6,078.32
Apparent errors in transferring receipts
3,124.93
from agent's summaries to deficiency
notices
Receipts per agent
$59,744.93
Receipts per return: Receipts returned
$53,581.30
Reported on 1949 sale of dairy cows (net)
$ 4,022.59
Total receipts returned
$57,603.89
2,141.04
$11,344.29
8. The year 1940 is not before us. However, the question of the extent of the audit is relevant to a determination of petitioner's knowledge of the correctness of claiming Aunt Effie as a dependent.↩
9. Under section 6654(h) of the 1954 Code, section 294(d) of the 1939 Code is applicable with respect to taxable years beginning prior to January 1, 1955.↩