**C. A. DUPREE, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 14659.

United States Court of Appeals.
Fifth Circuit.
Jan. 20, 1955.

John D. Cofer, G. Hume Cofer, Austin, Tex., for appellant.

Bradford F. Miller, Asst. U. S. Atty., C. F. Herring, U. S. Atty., San Antonio, Tex., Francis C. Broaddus, Jr., Asst. U. S. Atty., El Paso, Tex., for appellee.

Before HOLMES and TUTTLE, Circuit Judges, and ALLRED, District Judge.

TUTTLE, Circuit Judge.

This is an appeal from a conviction of the accused below in an income tax fraud case in which the government based its prosecution on circumstantial evidence which it considered met the standards required to make out a case on the available funds and expenditure method of proof. Appellant complains of error in the charge of the trial court, in the lack of sufficient evidence of available assets at the starting point, and in the rejection of evidence tendered by him to show absence of intent to do wrong.

The accused was indicted, tried and convicted on six counts under 26 U.S.C.A. § 145(b) of wilfully filing false and fraudulent income tax returns for the years 1946, 1947, 1948 and 1949. In the years 1948 and 1949 they were joint returns filed by the accused and his wife; in 1946 and 1947 the accused is charged with having filed false returns for himself and separate returns for his wife.

The government showed discrepancies in the reporting of income from interest in small amounts by comparison of appellant's returns with records of the bank that made the collection for him, but the principal case relied upon by the Government was that during the years in ques-

tion the accused's expenditures greatly exceeded the funds that were available to him, taking into consideration his known assets at the beginning of each year.

We have delayed decision of the appeal until we could have the benefit of the opinions of the Supreme Court in the four cases decided December 6, 1954. Holland v. United States, 75 S.Ct. 127; Friedberg v. United States, 75 S.Ct. 138; Smith v. United States, 75 S.Ct. 194; United States v. Calderon, 75 S.Ct. 186.

Although the four cases just decided by the Supreme Court involved prosecution on the increase in net worth method, much of what is said there is applicable to a prosecution in which the Government undertakes to prove that the taxpayer knowingly and willfully attempted to defeat and evade a large part of his income tax by showing that expenditures during the prosecution years in question exceeded the taxpayer's available funds.

We consider equally applicable to this type of case the observation by the Supreme Court in the Holland case, supra [75 S.Ct. 131]:

"The net worth method, it seems, has evolved from the final volley to the first shot in the Government's battle for revenue, and its use in the ordinary income-bracket cases greatly increases the chances for error."

■ We also consider equally applicable to a case like the one at bar the mandate of the Supreme Court in the same case stated as follows:

"While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. Cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 489, 71 S.Ct. 456, 465, 95 L.Ed. 456. Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. Charges should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused. Appellate courts should review the cases bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation."

The need for care in defining the terms and expounding the theory of this method of computation is clearly borne out by an analysis of the proof offered in this case. The words "available funds" are words that have an ordinary meaning and when used in relation to a computation to show that more money was spent than was "available" it would seem that it would require a listing of all the assets of the taxpayer at the beginning of the period. Here, however, the words "available funds" were used in three different senses—by Government counsel, by the Government's expert witness, whose computations were admitted in evidence, and by the Court.

Government counsel asked the witness if he had computed an opening net worth for 1940—five years before the prosecution years. The witness answered that he had, based on questioning the accused, and he itemized assets specified by the accused totalling approximately $49,500, which he identified, and then added that the accused stated that he also had "bank accounts" and a piece of property at 830 Arthur Street, Houston, Texas, to which he assigned no cost or value. He also said that at his first interview with the accused when he obtained this information, the accused also told him that he had accumulated cash savings of approximately $70,000, later stated by him to be from $65,000 to $80,000.

The Government sought to commence its computation of excess of expenditures over available funds by starting January

1, 1940. In spite of the testimony as to these available assets as of January 1, 1940, the Government's computations which were introduced in evidence did not include a single dollar of the listed items totalling some $49,500 or of the claimed cash accumulations.

In explanation of this computation the Government's witness testified that in making up his entries for "available funds" he used the term in the sense of "reported income" per tax returns. Thus the sources that were available to the taxpayer on January 1, 1940, from which he could make expenditures subsequent to January 1, 1940, and which were not disclosed in his report of income on his successive tax returns, were apparently ignored. A careful analysis of the computation does show that "available funds per return" were adjusted by adding a small withdrawal of bank balances under the heading "From Decrease in Bank Accounts." It is probable that other slight adjustments were made that give some effect to a small part of the taxpayer's opening net worth or available funds in the sense ordinarily used, but such computations as were testified to and as were included in the Government's principal exhibit were highly confusing to anyone not familiar with the technical use of the terminology employed by the Government's witness. For example, the witness listed the small bank balance increase of the accused amounting to $373.-76, as well as a small increase of $1.82 in his wife's account, under the heading of "Expenditures" for 1940, instead of listing them under "available funds." In the same manner he listed a mortgage of $1205 owned by Dupree as an "expenditure." The witness also included as "expenditures" all increases in bank accounts—a very substantial item during the first five year period. On careful analysis of the Government's method of proof, this treatment of increase in bank accounts can be understood but the treatment of items in the oral testimony before the jury and in the Government's written computation introduced as its principal documentary proof of its case

under terminology quite the opposite of the usual meaning of the terms employed, places on the trial court an unusual burden to clarify the issues, as pointed out by the Holland case, supra.

Having discussed some of the problems presented to the trial court and to the accused by the Government's method of developing its case, we now turn to the appellee's contentions that these problems were solved incorrectly and to his prejudice.

■■ The first element that must be established in this type of prosecution is what funds are available to the taxpayer at the opening date of the prosecution year. In this respect it is similar to a so-called "net worth" case. If there is no established figure showing the source from which expenditures during the year can be made, or the complete lack of such a source, then there is no relevance to proof of expenditures during the year, no matter how large they may be. See Bryan v. United States, 5 Cir., 175 F.2d 223.

The second element that must be shown is the "available funds" acquired during the year, as disclosed on the income tax return filed for the year, since "expenditures" matching such funds indicate only what would be expected of a taxpayer who filed a correct return.

In order to prove a failure to report the full amount of income by the use of this particular method, the Government must then show "expenditures" during the year in excess of the two items mentioned above, i. e., available funds at the beginning of the year and funds becoming available during the year and which were reported on the tax return.

The Government has still a further burden in this type of case. It is elementary that there are sources of funds that make their receipt non-taxable to the recipient. The Government, in proving its prima facie case must therefore exclude such sources of available funds by affirmative evidence.

■ The trial court below properly charged that each prosecution year must

stand alone, and that the Government must prove opening available funds for each year; for, obviously in a prosecution for the year 1946, there would be a complete failure of proof unless the excess expenditures shown were shown to have come from income received during 1946 instead of being expenditures in 1946 of accumulations from prior years, or even of unreported income for 1945 or prior years.

Recognizing fully, as we do, the difficulty of carrying the burden of proving the elements of such a case, it is still our duty to test the evidence on which this case was permitted to go to the jury over the objection of the defendant against the requirements here stated. In applying this test we find that the Government did not establish the first element of this computation. It did not establish the opening available funds as of January 1, 1946; nor did it establish this figure as to any of the subsequent years.

The Government did not even establish available funds as of January 1, 1940, the year from which it sought to construct its comparison between available funds and expenditures. The Government's brief says: "The best summarization of the evidence in the case is found in Government Exhibits 46, 47 and 52." These exhibits are headed respectively: "46 (P. 1) Computation of Net Available Funds as Reflected by the Income Tax Returns Filed by Clarence A. and Anna Dupree During the Years 1940 Through 1945; (P. 2) Analysis of Expenditures as Compared to Available Funds (1940–45); 47 (P. 1) Computation of the Available Funds as Reflected by the Income Tax Returns Filed by Clarence A. and Anna Dupree During the Years 1946 Through 1949; (P. 4) Analysis of Expenditures as Compared to Available Funds (1946–1949); 52 Computation of the Excess of Expenditures Over Available Funds 1940–1949."

Not a single dollar is shown as of January 1, 1940 on this exhibit as available funds as such. By a careful study of the testimony and of the exhibits it is apparent that, under the heading "Available Funds," sub-heading "Decrease in Bank Accounts,—San Jacinto Natl. Bank," a bank balance of $378.91 is shown. This was on hand January 1, 1940. Also, under the heading "Expenditures" and sub-heading "Increase to Bank Accounts—City National Bank-checking," a bank balance of $363.76 is entered, and under Union National Bank $1.82 is entered, and that these balances were on hand on January 1, 1940. So, too, there is entered as an "Expenditure" in 1940 under the heading "Net Mortgage Increase" $1205. From the testimony of the witness Patterson it is clear that this item was on hand on January 1, 1940. As well as we have been able to ascertain from a careful analysis of the record these are the only assets owned by the defendant or his wife that are given effect in setting up their initial available funds, and some of these are shown as "Expenditures" on the Government's exhibit instead of as "Available funds." To be sure, when the total of expenditures is arrived at in this same exhibit for the years 1940–1945, these figures are subtracted rather than being added to the entries of the other years, but a more confusing method of showing opening available funds would be hard to devise.

The principal lack of the Government's proof, however, is that it does not purport to exclude all other available funds. This is merely proof, confusingly presented, that on January 1st the Duprees *did* have available funds in the amount of $363.76 in one bank, $1.82 in another and $378.91 in another, and one mortgage owned by them in the face amount of $1205 on January 1, 1940.

The only other evidence of the absence of other assets owned by the taxpayer on January 1, 1940, is the testimony of the same Government witness, Gamel, who had been a special agent and who had worked up the case, as to two interviews which he had with Dupree. In these interviews, according to Gamel, Dupree listed specific property having a cost of

some $49,500 and an indebtedness on a business real estate mortgage of $14,000, and also stated that he had "bank accounts" and a specified piece of real estate not valued, and had in addition a sum of cash accumulated over the years since he was a boy in 1910 of from $65,000 to $80,000, estimated by him on the first statement to be $70,000. He also stated that his wife, who had worked for some twenty-five years, had cash, the amount of which however was not estimated by him. There was nothing in the statement by the accused to the effect that the items mentioned included all of his assets and there was no effort made by the Government to show, as a part of its case, what savings the wife had or that she had none.

Assuming, although not deciding, that the extra-judicial statement made by appellant to the Government agent would have been admissible over timely objection by him,[1] we can nevertheless consider it here because it was not objected to below. However, the effect that was given to the statements of the accused in the Government's presentation of its case, seems to be unprecedented in this type of prosecution. Ordinarily in a net worth prosecution the Government gives effect to disclosed assets or discharges its duty as set forth in the Holland case, supra, to track down "leads reasonably susceptible of being checked."[2]

Here the Government in the presentation of its case merely ignored the claim of assets made by the taxpayer as testi-fied to by the witness Gamel.[3] Having introduced evidence in the nature of statements by the accused that he had specified assets of a cost in excess of $49,500, plus a lot which he later sold for $6,000, plus bank accounts which were not identified, and having proved by a bank employee that the accused also owned a mortgage debt for $1205, and that the accused and his wife had bank accounts in his bank totalling approximately $800, the Government sought to build up a discrepancy between available resources and expenditures between January 1, 1940 and December 31, 1945, by showing (1) substantial personal spendings and (2) *increases* in five categories of assets—bank balances, purchase of U. S. Savings Bonds, purchase of U. S. Treasury Notes, increase in mortgages owned, and purchase of real estate, without attempting to account for any possible rearrangement of assets as to the $49,500 or for a penny of the $65,000 to $80,000, which appellant claimed he had on hand, or for any savings of his wife.

Having shown by this method an increase of $135,000 of his holdings or spendings over the amount shown by his income tax returns as being available (ignoring, as we have pointed out, whatever assets Dupree had on January 1, 1940, other than three or four items mentioned by him in his later tax returns), the prosecution then entered into the proof of the "expenditures" in the years 1946, 1947, 1948 and 1949, which were the basis of the prosecution.

1. See discussion of this point in Smith v. United States, supra.

2. Under the heading "The Government's Investigation of Leads", the Supreme Court in the Holland case says [75 S.Ct. 135]: "While sound administration of the criminal law requires that the net worth approach—a powerful method of proving otherwise undetectable offenses—should not be denied the Government, its failure to investigate leads furnished by the taxpayer might result in serious injustice. It is, of course, not for us to prescribe investigative procedures, but it is within the province of the courts to pass upon the sufficiency of the evidence to convict. When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence."

3. Compare the case of Bostwick v. United States of America, 5 Cir., 218 F.2d 790, in which the Government gave full credit to assets claimed by the accused in his extra-judicial statement to the agents.

The only justification which the Government could have had for ignoring the value of the assets claimed by appellant on January 1, 1940, was that Government counsel must have thought his contentions were incredible. However, none of the type of proof which was used by the Government in disproving the existence of the cash fund discussed in the Holland case, was brought to bear here. On the other hand, there is some substantiation of appellant's contention in the fact that it was undisputed that he had worked hard and lived frugally for many years during which, he testified without dispute, he had averaged $200 to $300 per month, that he had owned and operated a moving picture theater, that his wife had been a beauty shop operator and owner,[4] and that the couple owned a home which cost them in excess of $14,000 in the 1930s, and that he acquired his dance hall in 1939 with an equity of some $11,000 in the real estate. There is the further circumstance that in February, 1944, they made a gift of $20,000 to a Negro orphanage and in 1945 made a gift of $11,000 to a college in Houston. Possibly the most significant circumstance is that the Government witness Weber, who is the accountant who had made out the appellant's tax returns all during the 1940–1949 period, testified that Dupree showed him two $10,000 cashier's checks in February, 1944, with which to make the orphanage gift, and he told Weber then that his wife had saved this money.[5]

This was at a time when there was apparently no apprehension by Dupree of a tax fraud investigation. As a further indication of lack of tax consciousness, it is interesting to note that these two gifts were made in such a manner that only about $6,000 out of a total of $31,000 was deductible for tax purposes; whereas, if the gifts had been spread over the years in which the Government's computations extend, there would have been a reduction in net income for the period of some $24,000.

The above circumstances are cited to indicate that the contention of the accused as to the existence of substantial available assets at the beginning of the computation period is not without its persuasive aspects.

The Court having overruled defendant's motion for an acquittal on the completion of the Government's case, the defendant then put on his proof which did not materially change the complexion of affairs, except that he insisted he had saved practically every dollar he had made until he went into business; that this was possible because both he and his wife worked where they had their meals and many of their clothes given them. The wife testified that she too had saved for some 25 years of their married life since she started working as a beauty operator and later as the owner of a beauty shop and that her earnings were substantial. She also testified that she

4. Although the work performed by accused first as a hotel porter and later as a locker room attendant in a large country club does not of itself bespeak a life of luxury, the testimony of the accused and his wife in which she told of doing both household work and later beauty treatments at the homes of the wives of the same patrons of the club, as well as that of the substantial citizens who appeared as character witnesses for Dupree, brings his testimony well within the field of plausibility that they could have made very substantial savings, if that had been their aim.

5. "Q. Mr. Weber, before we recessed, I was asking about the $20,000 item in '44. You said you knew about that. Will you tell us what you know about that, please? A. I don't recall the exact date. It was either in '43 or '44, C. A. Dupree came to my office— "Q. Speak a little louder. A. I say C. A. Dupree came by my office and showed me two cashier's checks for $10,000 each. And I asked him what the occasion was, and he told me that his wife had saved that $20,000, dating back to his entrance into the army in 1917; that she had saved all of his allotment checks and had added to it income from work as a beauty operator and whatever other work she would perform, until she had accumulated this $20,000; and it was her intentions to establish a Negro orphanage."

gave the $20,000 to the Negro orphanage out of her savings accumulated prior to 1940.

With the testimony of the witnesses all in, the defendant again moved for a directed verdict of acquittal, which was denied, and the Court proceeded to charge the jury.

■ Among the specifications of error complained of by the defendant is that part of the charge of the Court relating to the available funds and expenditures method of proof. The particular part of the charge complained of was:

"In an expenditures case, attention is focused on the difference between the taxpayer's available funds as of the beginning of the prosecution year, as compared to the expenditures made during that year. This difference, if any, is presumed to be net income if certain conditions have been established by the evidence beyond a reasonable doubt to obtain. They are, one, that there is evidence of a source or sources of income to account beyond a reasonable doubt for the expenditures, if any; and, two, that there is a fixed starting point at which the taxpayer's financial condition has been by the evidence affirmatively established beyond a reasonable doubt."

This charge was not adequate in the circumstances of this trial. In the first place the theory of available funds expounded by the Government's principal technical witness, and as portrayed by his computations admitted in evidence, was quite different from that charged by the Court, in that in these computations the taxpayer's "available funds as of the beginning of the prosecution year" were not shown; rather, the computations showed only "available funds per return." The charge was therefore not adjusted to the evidence or the Government's theory of proof. There is also merit in the defendant's complaint to the Court's charge that the difference between available funds as of the beginning of the year and the expenditures made during the year is *presumed* to be net income if the other conditions mentioned have been established beyond a reasonable doubt. If it is to be assumed that these conditions had been established, there would still not be a presumption that the difference was net income, because one of the conditions was that there was a "source or sources of income to account beyond a reasonable doubt for the expenditures, if any." Since the jury had a perfect right to find that the source of such expenditures was from the sale of other assets or from accumulated savings, the Court in effect charged that an excess of expenditures over initial available funds was presumed to prove the existence of net income even if the jury was satisfied that the source of such excess of expenditures was of a nature which is not income under the Internal Revenue Code.

■ Moreover, while we do not need to decide expressly that the trial court can never charge a presumption against an accused unless such presumption is specifically created by statute, it is undoubtedly the better practice to tell the jury that such a difference, under proper definition, is evidence of additional net income.

Here we find that the Government's proof in support of its excess of expenditures theory lacked the essentials of adequate proof of opening available funds at the beginning of the entire period and lacked it at the beginning of any one of the prosecution years. Bryan v. United States, 5 Cir., 175 F.2d 223.

We also hold that the Court erred in giving the charge above over the stated objection of appellant's counsel.

The other questions raised by this appeal are largely answered by the series of Supreme Court decisions mentioned in the fourth paragraph of this opinion, and the trial court will have their guidance on the further disposition of this case, as we have had in our consideration of it.

■ There is one contention, however, that is made by appellant, which be-

cause of an apparent misconception by some Courts, should be further dealt with in the light of the Supreme Court's opinion in the Holland case, supra. This contention is raised by appellant's fourth specification of error in which he complained of the Court's refusal to submit to the jury the question as to whether defendant's books were adequate and accurate and in not instructing the jury not to consider the available fund and expenditure method if they found defendant's books to be adequate, or had a reasonable doubt thereof. This contention stems from the erroneous belief that Section 41 of the Internal Revenue Code restricts proof in a criminal case to certain formalized methods unless the Government first proves that the books and records kept by the taxpayer are themselves incorrect.[6]

The Supreme Court rejected this proposition and although the case before the Court was a net worth case, the language of the opinion is equally applicable to a case prosecuted on the available funds and expenditures method of proof. Section 41 relates to the computation of income by particular accounting methods in order that true income can be related to a particular taxable year. As the Court says [75 S.Ct. 133]:

> "The provision that the 'net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer', refers to methods such as the cash receipts or the accrual method, which

allocate income and expenses between years. United States v. American Can Co., 280 U.S. 412, 419, 50 S.Ct. 177, 179, 74 L.Ed. 518. The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. * * * *"

A prosecution for income tax evasion is not an effort by the Government to compute income tax at all. It is an effort by the Government to prove that the taxpayer failed to compute it honestly. There is nothing in this Section nor in any other applicable statute that restricts the Government in the method of proving this fact if it exists. On this point the Court says:

> " * * * To protect the revenue from those who do not 'render true accounts', the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history."

Finding as we do that an essential element of the proof necessary to take this case to the jury on the available funds and expenditures method was lacking, and that the Court's charge incorrectly presented this theory of proof to the jury, we must reverse the judgment below and remand it for a new trial.

Reversed and remanded.

---

6. 26 U.S.C.A. § 41:
  "General rule
  "The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clear-

ly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year."