Louis J. TAGLIANETTI, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

No. 6829.

United States Court of Appeals First Circuit.

Heard April 3, 1968.

Decided July 18, 1968.

John A. Varone, Providence, R. I., with whom Bruce M. Selya and John F. Mc-Donough, Providence, R. I., were on brief, for appellant.

John P. Burke, Atty., Dept. of Justice with whom Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Joseph M. How-

ard, Attys., Dept. of Justice, and Edward P. Gallogly, U. S. Atty., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a conviction under 26 U.S.C. § 7201 for income tax evasion during the calendar years 1956, 1957, and 1958. Appellant alleges failure of proof of an essential element of the government's prosecution under the "cash expenditure" method of establishing unreported taxable income, errors in various rulings and in the instructions of the district court at trial, and error in the court's consideration and disposition, pursuant to our earlier remand, of the question of possible taint occasioned by a wiretap of telephone conversations in which appellant took part. We affirm.

### The Net Worth Issue

Appellant filed joint tax returns with his wife for the years in prosecution, showing income from two sources: his employment as a "locations" man for a cigarette vending machine company and his net winnings from parimutuel bet-

ting. Relevant data from these returns are set forth in the margin.[1] The government's evidence at trial showed substantially larger amounts of income and tax due.[2]

The government proceeded on a "cash expenditure" theory. This is a variant of the net worth method of establishing unreported taxable income. Both proceed by indirection to overcome the absence of direct proof. The net worth method involves the ascertaining of a taxpayer's net worth positions at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income.[3] This method, while effective against taxpayers who channel their income into investment or durable property, is unavailing against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before. The cash expenditure method is devised to reach such a taxpayer by establishing the amount of his purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year.[4]

1.

| | 1956 | 1957 | 1958 |
|---|---|---|---|
| Wages | $2,400.00 | $4,160.00 | $4,160.00 |
| Parimutuel winnings | 5,105.00 | 4,960.00 | 5,290.00 |
| Adjusted gross income | 7,505.00 | 9,120.00 | 9,450.00 |
| Tax | 877.99 | 1,065.76 | 1,133.30 |

2.

| | 1956 | 1957 | 1958 |
|---|---|---|---|
| Adjusted gross income | $15,718.01 | $14,229.90 | $17,004.02 |
| Taxable income | 12,318.01 | 9,741.76 | 12,752.19 |
| Tax | 2,815.40 | 2,132.86 | 2,945.66 |

3. We have recently had occasion to deal with this approach in McGarry v. United States, 388 F.2d 862 (1st Cir. 1967), petition for cert. filed, 36 U.S.L.W. 3399 (3/1/68).

4. Judge Goodrich defined this method in United States v. Caserta, 199 F.2d 905, 907 (3d Cir. 1952), as follows: "It starts with an appraisal of the taxpayer's net worth situation at the beginning of a

period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. * * *"

The beginning and ending net worth positions must be identified with sufficient particularity to rule out or account for the use of a taxpayer's capital to pay for his purchases. If the end-of-year net worth position is equal to that at the beginning of the year, and if there are no non-taxable sources of income during the year, such as gifts or inheritances, the totality of the year's expenditures reflects total taxable income. If ending net worth shows an increase, the increase reflects an added component of income. If ending net worth shows a diminution, the decrease reduces pro tanto the extent to which expenditures reflect income.

In this case the government's evidence, based on appellant's admissions at several interviews and its own independent investigation, tended to establish that appellant and his wife owned very little property. They lived in rented premises until mid-1957 when they moved into a house inherited by his wife and sister-in-law. He owned a 1955 Cadillac which he traded in 1956 for a 1956 Cadillac, which was traded in 1957 for a Lincoln. He owned a boat which he sold in 1956, using the proceeds as part payment for a much more expensive boat. He owned no stocks, bonds, life insurance (except for $2,000 coverage in connection with a sickness benefit policy), or any other property. He had no checking account or savings account. His wife had one savings account opened in 1957 with a deposit of $1.00, and showing deposits totalling $212.50 in 1958. During the tax years he purchased a living room set and a sofa. His wife owned a fur coat which in 1956 was six years old and various items of jewelry purchased from individuals at undisclosed prices. In terms of day-to-day living, he and his wife lived frugally, took no vacations except for weekends, and did no entertaining. He gave his wife money for the household which, as of 1962, would amount to $40–$45 a week for food.

As for cash on hand, appellant during the taxable years would have about $10,000, borrowed from several banks or loan companies at 8 per cent interest for financing his parimutuel betting. He would have on his person at any one time $300 to $400. These funds were not used for his personal needs. As appellant expressed it, "The money I borrowed from the banks I cannot touch for anything at all. It's used expressively (sic) to finance my horse betting at the tracks. * * * I cannot, in no way, touch that money, even to buy food, for I would be licking myself." At the beginning of 1956, he owed $3,300 on an outstanding loan. During the taxable years he received $13,770 and paid back $18,700 in connection with such loans.

One other source of funds was the subject of contradictory evidence. In 1948 appellant had loaned one Ralph Merola $15,000. Appellant's first version was that the last time he saw Merola, presumably in 1958, Merola gave him $3,000 in cash and some "hot" Canadian bonds which he destroyed, and that Merola's wife paid him between $6,000 and $8,000 in 1959. Appellant's second version was that in 1958 Merola, desiring to repay the loan—now $14,000—as well as $5,000 which appellant had advanced to the Internal Revenue Service for Merola, gave him an envelope containing Canadian bonds which appellant destroyed on ascertaining that they were stolen. This version made no reference to cash. A third version came from an accountant, Bevilacqua, who helped appellant on his tax returns. He said that $1,000 was paid appellant by Merola in 1956, $6,000 in 1957, around $2,000 in 1958, and that Merola's estate paid $8,000 in 1959. Still another source of confusion stems from the filing of a suit in court against Merola's estate in 1959 for $14,000, the amount of a note executed in 1956.

Against this background, the government introduced evidence of expenditures

made and proceeds of loans received (except for the Merola loan) by appellant during the taxable years which resulted in the following totals:

| | 1956 | 1957 | 1958 |
|---|---|---|---|
| Total cash expenditures | $29,840.41 | $23,399.90 | $17,004.02 |
| Less: non-taxable receipts | 14,122.40 | 9,170.00 | — |
| Corrected adjusted gross income | $15,718.01 | $14,229.90 | $17,004.02 |
| Less: exemptions | 2,400.00 | 3,000.00 | 3,000.00 |
| | $13,318.01 | $11,229.90 | $14,004.02 |
| Less: deductions | 1,000.00 | 1,488.14 | 1,251.83 |
| Corrected taxable income | $12,318.01 | $ 9,741.76 | $12,752.19 |
| Unreported taxable income | 7,963.51 | 4,533.76 | 7,237.19 |

An accountant testifying for appellant presented his analysis which differed in two respects. He included as nontaxable receipts the $3,300 owed at the beginning of 1956 to a loan company, an additional $6,700 to bring appellant's total borrowings up to $10,000, a $1,000 payment by Merola in 1956, $6,000 in 1957, and $2,000 in 1958. He excluded from expenditures several items: food, Blue Cross, support of appellant's sisters, and two major payments for boat supplies.[5] The result was non-taxable receipts in excess of cash expenditures of $5,001.99 in 1956, $10,475.09 in 1957, and $9,136.73 in 1958.

Appellant's contention that there was a failure of proof in the government's case is, to follow his position as stated in his brief, " * * * that even assuming, *arguendo*, that the evidence adduced shows he spent more money during the indictment years than his reported gross income, there is not one scintilla of evidence to show that said expenditures came out of current receipts *only* and not out of available assets acquired in prior years. This is so because there is absolutely no competent evidence which, in any way suffices to clearly and accurately establish the extent of defendant's prior assets at the beginning of any or all the indictment years; i. e., there is no opening net worth for January 1, 1956, 1957 or 1958."

Appellant mistakes form for substance. In this case, the prosecution presented evidence to support the conclusion that the assets owned by appellant and his wife either remained at a static level, or instead increased over the taxable years, and in any event made no contribution to the expenditures shown. The jury was entitled to accept appellant's statement that he did not touch his loan proceeds for other than betting and to reject the testimony of payments received from Merola. There is no suggestion that cars, boats, furniture, jewels, or other property were disposed of to finance current purchases. The expense items excluded by appellant's accountant presented issues of fact which the jury obviously resolved against appellant.

This state of the proof fully satisfies the requirement in Holland v. United States, 348 U.S. 121, 132, 75 S.Ct. 127, 134, 99 L.Ed. 150 (1954), of "the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." [6]

5. We discuss, infra, the grounds on which appellant sought to exclude this evidence, none of which we deem well taken.

6. The government has also met the requirement that its proof accomplish the "effective negation of reasonable explana-

In a typical net worth case, as *Holland,* precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case reasonable certainty may be established without such a presentation, as long as the proof —as in this case—makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures. We recognize that courts occasionally blur the distinction between the two approaches and use language implying that they are subject not only to the same principle of excluding the availability of nontaxable resources but also to the same method of implementing that principle, i. e., establishing net worth figures.

Appellant has cited several cash expenditure cases for the latter proposition. A careful review of the language used and the problems addressed in these opinions indicates that they cannot be fairly read as embracing such an inflexible formal requirement.[7]

 In the case at bar it is apparent that while the jury may not have been apprised of the dollar value of each of the assets comprising appellant's opening net worth, it was so informed as to his cash on hand and the few non-liquid items which were disposed of or acquired during the course of each prosecution year. A running series of net worth statements would not have added to the jury's understanding. We therefore hold that the proof adduced here was sufficient to al-

tions by the taxpayer inconsistent with guilt." 348 U.S. at 135, 75 S.Ct. at 135. Appellant has contended that "[t]here is no evidence in the record of. any investigation as to available funds, despite the mention of various banks in the April 23, 1962 interview * * *." Three institutions were specifically named as having loaned appellant money from 1956 through 1960 and one other vaguely identified. One was the source of the government's evidence as to loans. A second was checked but defense objections to testimony by a government agent were sustained. There is not only no suggestion by appellant that any currently outstanding loans were ignored but, even if there were, his statement that such funds were untouchable for personal use renders insignificant any missing loan data.

7. In Olinger v. Commissioner of Internal Revenue, 234 F.2d 823 (5th Cir. 1956), the prosecution had proven only that taxpayer had made stock purchases during the tax year. No proof whatsoever was introduced as to net worth. The court said, "the application of the cash expenditure method * * * with neither a head nor a tail to it will not do." Id. at 824. We quite agree. There must be enough proof of both head and tail to rule them out as explanations of the expenditures. In Dupree v. United States, 218 F.2d 781 (5th Cir. 1955), the prosecution had ignored considerable evidence of the existence of sources of available funds at the beginning of the taxable period. It stated the requirement of "a listing of all the assets", equated "open-

ing net worth" and "available funds in the sense ordinarily used", and said: "The first element that must be established in this type of prosecution is what funds are available to the taxpayer at the opening date of the prosecution year. In this respect it is similar to a so-called 'net worth' case. If there is no established figure showing the source from which expenditures during the year can be made, or the complete lack of such a source, then there is no relevance to proof of expenditures during the year * * *." Id. at 784. Again we agree but do not assume that this language restricts proof to a formal net worth statement so long as sources of available funds are identified and quantified. In United States v. Caserta, supra n. 4, the court refers to "an appraisal of the taxpayer's net worth situation at the beginning of a period" and the need to account for any subsequent changes. Here, too, we see no intimation that these objectives can be accomplished only through formal net worth statements. Finally, in Ford v. United States, 210 F.2d 313 (5th Cir. 1954), cert. denied, 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53 (1956), the court refers to the necessity for "a satisfactory starting point" and, reviewing prosecution evidence similar in nature to that in this case, declared the requirement satisfied. So far as the opinion discloses, no formal net worth statements were used, the evidence as to the "starting point" coming from testimony of the I.R.S. special agents who reported on their investigation.

low the jury an intelligent determination of the single relevant issue; whether any expenditures found to be in excess of reported income can be accounted for by assets available at the outset of the prosecution period or non-taxable receipts during the period. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943).

### Rulings at Trial

Appellant complains that the trial court erred in refusing to declare a mistrial following the Assistant United States Attorney's prejudicial reference in his closing argument to the war in Viet Nam and again when he commented on hearsay evidence excluded during the trial.

To be sure, even though defense counsel intimated that the government agents were not disinterested witnesses, it was highly improper for the prosecution to describe them as laboring "for the United States Government in order to protect the taxpayers from people who are cheating on their income tax, to get the dollars and cents we need in the till to fight Communism, to fight the war in Viet Nam. * * *" See Viereck v. United States, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734 (1943); Greenberg v. United States, 280 F.2d 472, 474 (1st Cir. 1960). Unlike Viereck and Greenberg, however, the court below promptly instructed the jury to disregard the argument and emphasized that it was to decide the case on the evidence alone without regard to "any appeal to Viet Nam and any other federal problem". We cannot say that the U. S. Attorney's remarks in a trial as lengthy as this were of a kind the jury could not put out of its mind after having been told to do so. Az Din v. United States, 232 F.2d 283, 285–286 (9th Cir.), cert. denied, Az Din v. United States, 352 U.S. 827, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956). Nor do we consider

the government's case so weak that the court's curative instruction was insufficient. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 237–240, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). As for the government's improper reference to hearsay evidence, we hold the court's timely instruction to disregard likewise sufficient. Cf. Kitchell v. United States, 354 F.2d 715, 719 (1st Cir.), cert. denied, 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032 (1966).

Appellant also alleges error in the court's allowance into evidence of portions of testimony from pre-indictment I.R.S. interviews. He asserts their inadmissability because the government failed, prior to each interview, to give him all of the Miranda warnings, viz, to notify him of his right to counsel, and because the information he disclosed at those sessions was not given voluntarily but was "tricked" out of him. We have now on several occasions stated our views as to the applicability of Miranda at I.R.S. office interviews. Spinney v. United States, 385 F.2d 908 (1st Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); Morgan v. United States, 377 F.2d 507 (1st Cir. 1967); Schlinsky v. United States, 379 F.2d 735 (1st Cir.), cert. denied, 389 U. S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967). Our conclusion was and is that the Miranda requirements do not extend to that kind of activity.[8]

Counsel argues, however, citing Morgan, that our decided cases do not control the situation before us here since appellant was "tricked into giving information about years he did not believe were under investigation." Even had appellant been in custody, Flaherty v. United States, 355 F.2d 924 (1st Cir. 1966), vacated on other grounds, Picciali v. United States, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1968), we do not see any evidence that appellant was the victim of fraud or trickery. The October

8. Cf. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (May 6, 1968), where the Supreme Court held that Miranda does extend to an individual already in jail who is "interviewed" by I.R.S. agents about tax matters, however, unrelated they may be to the offense for which he is in custody.

6, 1961 interview was statedly held to discuss appellant's income tax for the years 1959 through 1960. The interview was, in all important respects, confined to questions relating to those years. Moreover, he was informed that anything he might say could be used against him at "any proceedings which may hereafter be undertaken by the United States." Finally, at the April 23, 1962 interview appellant, in addition to being advised again of his right not to answer, was told that the Internal Revenue Service was conducting an official investigation of "your income tax returns" with no dates supplied. This sequence suggests to us the natural evolution of an investigation rather than a preconceived plan to give a misleading notice as to the years 1959 and 1960 and then inquire about earlier years. Had this been the motive, we see no reason for the narrow scope of the first interview.

We next consider appellant's argument that certain expenditure figures produced by the government were improperly allowed into evidence. Specifically, appellant alleges error in the admission of certain business records of Ideal Windlass Co., a marine equipment supplier with whom he did business; in the admission of his Blue Cross rate card on which were recorded itemized cash payments; and in the admission of food and household expense figures based on answers he gave at one of the pre-indictment I.R.S. interviews.[9]

 Use of the Ideal Windlass records is challenged on the ground that the initials "F. M." appearing beside all but a few cash payment entries made during 1957 and 1958 to an account opened in the name of Frank Moretti, appellant's brother-in-law, and only later changed to read "L. T.", suggest that Moretti and not appellant was the source of some $3,200 worth of expenditures alleged by the government to have been made by appellant for boat supplies. On review we cannot say it was error to

have admitted the records. The ledger account in 1956 carried both names, Moretti's in parentheses following appellant's. The change of name on the account records for 1957 and 1958 could be taken to be a correction intended to reflect the actual charge customer. The initials "F. M." next to payment entries might well mean that while Moretti physically made the payments he did so on behalf of and with funds provided by appellant. Indeed, it was appellant and not Moretti who owned the boat for which these supplies were purchased. And Moretti, when he took the stand, could not remember whether he made the payments attributed to him even though some were substantial. This background convinces us that it was within the discretion of the court to admit into evidence the Ideal Windlass records and that it was for the jury to decide if the recorded cash payments were made by appellant or someone else.

 So, too, with the Blue Cross and food and household expense figures. As to the former, the jury could have concluded that while there is no direct evidence indicating who made the insurance payments credited to appellant's rate card—appellant himself, his employer, or another—the reasonable inference is that they were made by appellant directly. This is especially so since appellant listed himself as unemployed at the time he applied for coverage, did not participate in a group plan, and allowed his policy to lapse for three months. As to the latter, the jury could have concluded from appellant's statement made during a 1962 I.R.S. interview that he "gives" his wife about $40 or $45 a week, that his household expenses ran in those figures during the earlier prosecution years as well. This is especially so since in describing the system he and his wife used to pay bills appellant more than once spoke in the imperfect tense, suggestive of repeated or customary action over a period of time in the past.

9. We consider appellant's claimed error with respect to the admission of testimony bearing on support payments for

dependents together with the requested instruction on the same matter, infra.

Appellant also asserts error in the failure of the court below to charge the jury in accordance with certain requested instructions. Our preceding discussion disposes of some of his claims. Others we find to be wholly without merit. We will limit our remarks here to the few which we think deserve comment.

First is the requested instruction that the alleged expenditures for dependent support must be disregarded. The sum of $768 was charged against appellant for each of the prosecution years 1957 and 1958 as the amount expended for the support of a dependent sister. The government derived this figure from a Form 2038 filed by appellant in 1958 in which he stated that he expended the following amounts in behalf of his sister: food, $461; clothing, $100; shelter, $150; medical, $50; and other, $50. Appellant argues that these figures should not have been used against him in either year since they represent a proportional share of expenses already reported by him or charged to him and that their inclusion in this context constitutes double-counting. Alternatively, he argues that the figure should not have been used in 1957 since no itemized Form 2038, evidencing the extent or nature of his expenditures, was appended to his return for that year.

▆▆▆ With respect to the double-counting issue, we think it not unfair that where, as here, the government produces evidence of expenditures which are particularly within the knowledge of a defendant, the burden of coming forward with more precise information shifts to the defendant. See Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967). Appellant has not sustained this burden; all he did below was to

raise the issue.[10] In any event the largest stipulated expense—$461 for food—was presumably not part of appellant's general food expenditure since a sister was a dependent for only two years while his estimated family food expense, stated in general terms, apparently reflected costs over a period of years. And since one sister was living in his house in 1957 and another in 1958 it is not unreasonable to charge him with expenditures at least in the amount of $461 for that year as well. The difference in each year between $461 and $768, assuming that difference was improperly charged against appellant, was de minimis in view of the substantial underreporting of income.

▆▆▆ A second requested instruction was that where facts or circumstances are susceptible to two reasonable inferences, one of which points to innocence and the other to guilt, the jury must acquit the defendant. Of this we need only say that the Supreme Court, addressing this matter, has concluded otherwise. "[T]he better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect * * *." Holland, supra 348 U.S. at 139–140, 75 S.Ct. at 137. The jury was so properly instructed.

▆▆▆ Another requested instruction was that "[f]or each of the indictment years, the government must prove beyond a reasonable doubt, not only that the expenditures of the taxpayer exceeds (sic) the amount he returned as income; but also must prove that his net-worth at the end of each year is higher than, or at least equal to, his net-worth at the beginning of the year." As an ab-

10. For example, the only detailed evidence for clothing purchases in 1958 indicated that the items bought were boys' clothing. In view of the total clothing expenditures—averaging $212 a year over the three year period for appellant, his wife and his two sons—it was a fact question whether the listed "clothing" expense was accounted for by the clothing store charge account records already introduced in evidence. Appellant made no effort to show that it was so accounted for. Likewise, it is not clear that the listed "shelter" expense represents a percentage of the mortgage payments. It may have referred to some other expense such as fixing up or maintaining quarters within appellant's home for his dependent sister.

stract statement of the law, this is not accurate. The prosecution can still make out a cash expenditure case even though a taxpayer's net worth at the end of the year was less than at the beginning, provided that this decrease was not enough to equal or exceed the difference between reported income and nontaxable receipts during the year on the one hand and total expenditures on the other. The court was not obliged to accede to such request.

■ Appellant preserved his objections to the court's refusal to grant his requested instructions, and objected specifically to several portions of the court's instructions. He made no objection to the part of the charge involving the issue raised by his own request.[11] Even were we to consider that Fed.R.Crim.P. 30 had been complied with, we would find no error under the circumstances of this case. While the court's instruction confined the exculpatory explanations for appellant's expenditures to "non-taxable receipts, such as * * * loans", there was no suggestion in the record that there were available non-taxable resources other than the proceeds of loans made to appellant or repayments to appellant of the Merola loan, both of which were adequately covered by the court's language. Any reference to the influence of other assets on hand at the beginning of the taxable period or diminution of net worth would have no support in the record. Under these circumstances the court's instruction was not error. Pacheco v. United States, 367 F.2d 878, 880–881 (10th Cir. 1966); Davis v. United States, 226 F.2d 331, 336 (6th Cir. 1955), cert. denied, 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed. 838 (1956).

*Wiretapping and Surveillance*

Appellant also alleges error in the district court proceedings following our remand after conviction to determine whether or not, upon an examination of facts relating to a disclosure by the government that certain of appellant's business telephone conversations had been monitored as part of a general surveillance of the activities of his employer, appellant's conviction should stand or a new trial should be ordered.

■ To begin with, it is asserted that the district court erred in denying a defense motion to return the case to this court in light of a further disclosure by the government, made subsequent to remand but before hearing, that an attorney-client conversation involving appellant was among those overheard by F. B. I. agents. In our first consideration of this matter we were persuaded that Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966), the only one of what are now four cases dealing with the question of remand versus automatic new trial in surveillance situations, was distinguishable from this case and its mandate ordering a new trial inappropriate. *Black* involved monitored conversations between petitioner and his attorney about matters then before the grand jury and which eventually ripened into trial and conviction. The conversation was admittedly communicated by the F. B. I. to the revenue agents who were working on the case. While we were of the belief that here there was not the slightest intrusion into an attorney-client relationship, our decision to remand was not governed by that fact alone for we said of *Black* that "not only do we find great emphasis on the interference there with the attorney

11. The court's instruction was as follows: "In determining whether or not said expenditures, if in fact they were made by the defendant as claimed by the Government, were made from taxable income and not from nontaxable receipts, you should consider whether the Government has run down all the reasonable leads suggested to its agents tending to establish the defendant's innocence and explored any explanations advanced by him during the investigation as to the sources of non-taxable receipts by him, such as loans. If you are satisfied that all such reasonable leads and explanations have been exhausted or refuted, this may be persuasive evidence to consider in determining whether or not said expenditures represent taxable income."

client relationship, but we find considerable reason for supposing that this was a matter of particular importance." We went on to indicate what we considered the real nemesis: "subtle benefits that might consciously or unconsciously accrue to the government in knowing the planned procedure, or even the state of mind of the defendant and his counsel *with respect to the trial,* quite apart from hearing affirmative evidence, or leads to evidence." (emphasis added) Thus, the fact of monitoring an attorney-client conversation without more—specifically, without a concession that the matter discussed involved the alleged offense in question—neither required automatic retrial nor, in the circumstances of this case, compelled the district court to return the matter to us without rehearing.

The cases following *Black* do not suggest otherwise. O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), in which the Court also ordered a new trial, likewise involved eavesdropping on a conversation between petitioner and his attorney about the controversy in question and is in this respect no different from *Black.* While it appears that there, unlike in *Black,* neither the fact nor substance of the conversation was communicated to prosecuting attorneys for the Justice Department, we do not interpret this to mean that one isolated illegal intrusion on attorney-client conversations on matters demonstrably separate from the instant proceedings automatically requires a new trial.

Granello v. United States, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), decided after *O'Brien,* offers affirmative support for this interpretation. That case, in which the Court denied

a petition for a writ of certiorari, involved monitored conversations between petitioner and attorneys representing him in matters other than the income tax charge leading to his conviction and appeal. While it does not appear that the attorneys whose conversations were overheard were the same attorneys who represented petitioner in the immediate controversy, as is the case here, it is nevertheless significant that the Court chose not to apply *Black* and *O'Brien* where it was perfectly clear that the tainted conversations bore no relation whatever to the offense charged.

▆▆▆▆ To the extent that the district court in a situation like that here can determine, after hearing, whether or not the subject matter of the overheard attorney-client conversation involved the legal charge at bar, remand and not retrial is, at least initially, the appropriate course.[12] We think the wisdom of this course is illustrated by this case. The district court, after a detailed examination of records and a protracted hearing, concluded that no evidence or leads affecting appellant's trial were generated by the electronic surveillance. 274 F.Supp. at 226.

The evidence, viewed from any facet, justified the court's conclusion. The surveillance of a place of business of one of appellant's associates took place between March 6, 1962 and July 12, 1965. Daily logs and tapes would go to a special agent of the F. B. I in Boston who would dictate a memorandum or simply a teletype message for Washington F. B. I. headquarters. No dissemination of any such information was made to the Internal Revenue Service in Washington or anywhere else. The Internal Revenue agents and the U. S. Attorneys working on appellant's case had no knowledge of

---

12. We do not read Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967), as requiring any other disposition. The Court did distinguish *Black* and *O'Brien* by stating that unlike those caes, "[t]here was [in *Hoffa*] apparently no direct intrusion * * * into attorney-client discussions." Id. at 233, 87 S.Ct. at 1584. Viewing *Hoffa* in the light of *Granello*, we read "direct intrusion" as an intrusion relevant to the current prosecution. Otherwise, an illegal wiretap on a conversation between a taxpayer and his attorney relating, for example, to a domestic relations problem would guarantee him a new trial in any criminal prosecution.

the existence of the information. The district court's conclusion does not rest merely on testimony of lack of knowledge. The court also found that the basic work papers and report on appellant's case were completed on March 5, 1962, one day before the surveillance commenced. These papers contained either the evidence or the leads to evidence for every item of proof presented by the government at trial—except appellant's own estimate of his expenditures for food in the April 23, 1962 interview.

Insofar as the single conversation overheard between appellant and his attorney is concerned, the brief reference to appellant's being asked by the attorney if he would sign a form "I.R.S. wants" relates to a waiver of the statute of limitations (Form 872) for the tax year 1961. The attorney was relaying a request of the I.R.S. to appellant on a civil matter for a later year than those involved in this case. The information as to this call was not even reported to Washington F. B. I. headquarters. Only if intrusion of a conversation between attorney and client requires retrial as a matter of law—which we do not think to be the law—could this conversation be deemed a ground for retrial.

Appellant, however, asserts on procedural grounds that this finding cannot stand because it is a judicial determination based upon an inadequate factual record, necessarily made so by the court's refusal to compel the government to produce all of its records relating to the surveillance of appellant's employer at the latter's place of business (irrespective of whether or not appellant was a participant in any given monitored conversation).

Subsequent to remand but before hearing appellant moved for discovery and inspection of all tapes, log summaries, interpretive reports, names and addresses of participating government agents and employees and all interdepartmental correspondence arising out of and relating to the surveillance of appellant's business associate. The court ordered production of all logs, airtels, and memoranda of conversations to which appellant was a party and disclosure of the names, addresses and status of all government agents who prepared or participated in the operation of the surveillance.

We do not understand appellant to argue that he has a right to inspect logs or memos of conversations in which he was not a participant. Indeed, that point he wisely conceded before the district court. His claim, rather, is that because so many of the records to which he was given access demonstrate a lack of certainty on the part of the government as to the identity of all parties to various monitored conversations, he can be assured of knowing if some of the doubtfuls were in fact himself, and then whether the subject matter discussed related to his case, only by a full inspection of everything.

 There is no question but that some logs evidenced indefiniteness and that certain airtels indicated that appellant's name had been filled in where doubt existed. The government explained, however, and convincingly so, that while the monitors were not always themselves familiar with appellant's voice, so that there were blanks or questions in their reports, Special Agent Kehoe, to whom the logs and tapes were sent each day, upon listening to each tape could and did make certain identification of appellant in every instance where he was a party to an overheard conversation. The court examined all of the unproduced papers *in camera*, and, agreeing with the government, concluded that none of them involved conversations in which appellant participated or were in any other way relevant to the instant case.[13] Appellant argues that it was

13. While the court had to rely on the accuracy and honesty of Agent Kehoe in concluding that no recorded conversation involved appellant, it was not dependent on any agent for its conclusion that no conversation which it reviewed related to the case. We see no potential for prejudice in the possibility that some

improper procedure for the court to have made an *in camera* inspection, but cites to us no persuasive authority to support his position.[14] His claim is that he has demonstrated a "strong showing of necessity" for production which, for purposes of analogy we translate as "particularized need". See Dennis v. United States, 384 U.S. 855, 874, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Yet a reading of such a case as *Dennis,* involving a conspiracy fraudulently to obtain the services of the National Labor Relations Board, suggests that appellant has not established the kind of need which requires automatic disclosure and forecloses *in camera* inspection. There the Court ordered production of grand jury minutes recorded some seven years prior to trial so that defendant could evaluate the consistency of testimony of certain prosecution witnesses for impeachment purposes. While stating on the narrow issue before it that "it is [not] realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities", 384 U.S. at 874–875, 86 S.Ct. at 1851, the Court said more generally:

"The determination of what may be useful to the defense can properly and effectively be made only by an advocate. The trial judge's function in this respect is limited to deciding whether a case has been made for production, and to supervise the process: for example, to cause the elimi-

nation of extraneous matter * * *."
Id. at 875, 86 S.Ct. at 1851.

We see the *in camera* function of the district court here as nothing more than such an exercise in eliminating "extraneous matter". To engage in this procedure was especially appropriate since the government has a substantial interest in preserving the secrecy of its investigation of organized crime, the subject of the surveillance in question.

Affirmed.

conversations involving appellant, but having nothing to do with the case, may have been misidentified. A finding of unrelatedness was by definition a judgment that matter was extraneous, not that matter arguably relevant lacked any usefulness to appellant. See Dennis v. United States, infra.

14. Characterizing his request for production as pretrial discovery of illegally monitored conversations, appellant relies principally upon United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), for the proposition that *in*

*camera* consideration was improper. *Coplon,* however, involved the wiretapping of an accused's home and office telephones and all monitored conversations included her as a participant. The Second Circuit held that it was error for the judge to have read the records *in camera* to determine whether or not the taps led to any evidence introduced at trial. In our case the purpose of the *in camera* review was not to determine whether any evidence was tainted by the surveillance but to determine whether any of the records not already produced for appellant's use involved him as a party so that they should have been produced.