UNITED STATES of America

v.

John T. READ, Jr.

No. 7938.

United States District Court,
D. Rhode Island.

June 7, 1973.

Lincoln C. Almond, U. S. Atty., Providence, R. I., for plaintiff.

James R. McGowan, Providence, R. I., for defendant.

MEMORANDUM AND ORDER

PETTINE, Chief Judge.

This matter involves a motion to suppress certain evidence obtained by the government during an investigation of the defendant who is charged with filing a fraudulent tax return for himself and his wife for the years 1966, 1967 and 1968.

An evidentiary hearing was held on May 14, 1973 at which the defense called four witnesses. The seminal question concerns the admissibility of evidence obtained by IRS prior to April 7, 1970 and on July 2, 1970.

On pain of repeating a well known fact to those acquainted with Internal Revenue procedures the Service conducts all routine tax examinations through its audit section. If in the course of any such investigation evidence of tax fraud is uncovered, the matter is referred to the Intelligence Division to be exclusively handled by that department for investigation and recommendation as to possible criminal prosecution.

On June 5, 1969 a routine tax investigation was commenced against this defendant which resulted in the production by the defendant of certain savings passbooks and business records for the years 1966 and 1967. Though the evidence is somewhat ambiguous, it does appear that prior to April of 1970 the tax auditor concluded there was evidence of possible tax fraud. Adhering to its well established practice the audit department on August 19, 1969 referred the case to the Intelligence Division which in turn accepted such responsibility on August 21, 1969. The first contact with the defendant by the Intelligence Division took place on April 7, 1970. It is undenied that all of the taxpayer's records obtained by the Audit Division were available to the Intelligence Division without any prior clearance or notice to the taxpayer.

On January 19, 1970 the Intelligence agent (Mr. Gray) wrote the defendant as follows:

"Dear Sir:

In connection with an investigation of your income tax liabilities for the years 1966, 1967 and 1968, you are requested to appear at the Office of the Intelligence Division, Internal Revenue Service, Room 210, 130 Broadway, Providence, R. I., on Friday, January 23, 1970, at 1 P.M.

If you are unable to appear at the specified time, kindly call Special Agent Robert Gray at 528–5263 to arrange for a meeting at a mutually agreeable time."

As a result of this correspondence the defendant met with Mr. Gray on April 7, 1970. Mr. Gray testified that at the outset of this meeting he told the defendant that he was conducting a criminal investigation; that it was no longer an audit question and that he had a right to an attorney, remain silent, and to non-production of records relating to tax liability.

Mr. Gray further testified that he advised the defendant to retain an attorney who in turn replied he desired to co-operate and saw no need for such a lawyer. I accept this testimony and so find over that of the defendant that he was not so advised on April 7, 1970 prior to being questioned.

As far as this court can determine, the records obtained by Mr. Gray subsequent to April 7, 1970 were a series of bonds valued at $69,000 and a statement taken on July 2, 1970. There was no reiteration of rights to the defendant at the time the bonds were revealed but there was on July 2, 1970.

The defendant offers a number of arguments viz.:

1) that the defendant was not notified of his constitutional rights until July 2, 1970 and, therefore, all evidence acquired by IRS prior to said date should be suppressed;

2) that even if the court accepts IRS testimony that the defendant was advised of his rights on April 7, 1970 as stated by Mr. Gray, it was inadequate and incomplete because the taxpayer was not told that anything he said might be used against him;

3) that the government cannot use the information it obtained during the civil audit for failure to first notify the defendant of his constitutional rights and thus obtain an intelligent waiver before making such records available to the Intelligence Division.

I see no merit in the defense argument and thus deny the motion to suppress.

*Conclusions of Law*

In light of my findings that notice was given the defendant at the initial meeting on April 7, 1970, I turn to the question of its adequacy.

A November 26, 1968 Internal Revenue Service News Release imposed on special agents of the Internal Revenue Service certain notice requirements to be given the taxpayer being investigated. Said release stated:

"One function of a Special Agent is to investigate possible criminal violations of Internal Revenue laws. At

the initial meeting with a taxpayer, a Special Agent is now required to identify himself, *describe his function, and advise the taxpayer that anything he says may be used against him.* The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions *or producing any documents,* and that he has the right to seek the assistance of an attorney before responding." (Emphasis supplied.)

In this Circuit the first judicial scrutiny of this public pronouncement came in 1970 in United States v. Leahey, 434 F.2d 7 (1970). The court held

". . . we hold that the agency had a duty to conform to its procedure, that citizens have a right to rely on conformance, and that the courts must enforce both the right and duty." (at page 11.)

In 1972 the court had another opportunity to evolve the preciseness needed in advising a taxpayer. In United States v. Bembridge, 458 F.2d 1262 (1st Cir. 1972) the court rejected the need for a "specific verbal formulation" of the IRS News Release. Conceding the omitted portions of the warning in this case are different from those in *Bembridge,* it appears to me, nevertheless, the rationale is the same. In *Bembridge* the "warnings given by the Special Agent did not use a sentence quoted in an earlier IRS news release [that is] 'As a special agent, I have the function of investigating the possibility of criminal tax fraud.'" In the case at bar the agent did not specifically warn the taxpayer that any statements he made might be used against him.

■ As in *Bembridge,* I cannot see how Mr. Gray's failure to specifically articulate each phrase of the required warning should inter the evidence under this motion. The warning must be evaluated in its entirety and in the posture of the one given in this case suppression of the evidence given to the audit agent would be exaggerated sentimentality for unfounded naiveté in this taxpayer. In-

deed, how unsophisticated must one be to believe for a moment his statements would not be used against him after having been told he was being investigated for possible criminal conduct and therefore had the right to remain silent and to an attorney. In this case I am "disinclined" to "irrevocably lock" an agent into so purist an approach as to require of him a virtual verbatim recitation of the News Release.

■ The more troublesome issue surrounds the use by the Intelligence Division of the information legitimately obtained during the civil audit. "Pre IRS November 26, 1968 News Release," this Circuit's decisional law did not apply *Miranda* warnings at IRS office interviews. Spinney v. United States, 385 F.2d 908 (1st Cir. 1967) cert. denied 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968). In the margin of *Taglianetti,* the court cited Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) as analogous authority. In *Mathis* ". . . the Supreme Court held that *Miranda* does extend to an individual *already in jail* who is 'interviewed' by I.R.S. agents about tax matters, however, unrelated they may be to the offense for which he is in custody". *Taglianetti, supra,* N.8 (emphasis added). It follows, therefore, I need not consider the *Mathis* holding in this case which in no way involves custodial interrogation. The issue to be resolved, however, is whether the teachings of United States v. Leahey (1970) and United States v. Bembridge (1972) discussed, *supra,* extend to voluntary audit interviews. I conclude they do not.

The wording of the News Release itself points to no other direction when it speaks of a special agent's function investigating possible criminal violations. This policy making rule specifically states, "One function of a special agent is to investigate possible *criminal violations* of Internal Revenue Laws. At the initial meeting with a taxpayer, a special agent is now required. . . ."

Surely this refers to the Intelligence Division function and not the routine tax audit in which the taxpayer participates voluntarily and no stain of trickery or fraud marks the government investigator.

I find further support from the 5th Circuit opinion of United States v. Pruden, 424 F.2d 1021 (1970) which sets forth "a detailed review" of *Miranda* requirements in situations similar to the one at issue [1] and United States v. Sclafani, 265 F.2d 408 (2nd Cir. 1959)—

"A 'routine' tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and willful omission.

'Surely defendant was aware that, if a "routine audit" revealed evidence of criminal liability, the agent would not ignore it merely because he was primarily concerned with civil liability. * * * A statement that the purpose of an investigation is a "routine audit" is not the equivalent of a promise that only civil liability will be considered regardless of what the examination reveals. Nor would any accountant or businessman so understand it.' United States v. Wolrich, D.C.S.D.N.Y. 1954, 119 F.Supp. 538, 540 (Dimock, J.).

Moreover it is unrealistic to suggest that the government could or should keep a taxpayer advised as to the direction in which its necessarily fluctuating investigations lead. The burden on the government would be impossible to discharge in fact and would serve no useful purpose." *Sclafani*, 265 F.2d at pp. 414–415.

I find this reasoning compelling. There is nothing in this evidence indicating that this defendant was not competent to fully appreciate the true import of all that transpired between him and the Internal Revenue agents. He is a grammar school graduate with "a couple of years of high." As a witness in this evidentiary hearing it was obvious to me he is an intelligent person and from the record it can be concluded a reasonably competent businessman. He surely knew the agents were pursuing evidence of misreporting. For reasons best known to himself, he chose to co-operate and willingly participated in the various conferences. He voluntarily delivered all requested material to the agents.

This court finds that all evidence obtained by the government, either prior or subsequent to July 2, 1970, was legally secured and should not be suppressed.

So ordered.

---

1. The court notes two decisions from the Seventh Circuit reaching a contrary result.—United States v. Dickerson, 413 F. 2d 1111 (7th Cir. 1969) and United States v. Habig, 413 F.2d 1108 (7th Cir. 1969) cert. denied 396 U.S. 1014, 90 S.Ct. 559, 24 L.Ed.2d 506.