DONALD S. COOPER AND PATTY J. COOPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Cooper v. Commissioner
Docket Nos. 4957-71 and 4019-72.
United States Tax Court
T.C. Memo 1978-178; 1978 Tax Ct. Memo LEXIS 337; 37 T.C.M. (CCH) 760; T.C.M. (RIA) 780178; May 15, 1978, Filed Martin J. O'Fallon, for the petitioners. Thomas M. Ingoldsby, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes plus additions to tax under section 6653(a): [1] Year
Deficiency
Section 6653(a)
1967
$47,957.44
$2,397.81
1968
36,989.28
1,849.46
Because of concessions made by the parties, the issues remaining for decision are: 1. Whether petitioners understated their income for 1967 and 1968 as determined by the source and application of funds method of reconstruction of income. 2. Whether petitioners are entitled to a deduction for interest paid to the Rocky Mountain Bank in excess *339 of $2,853.32 in 1967. [2]
3. Whether petitioners are entitled under section 107 to exclude from their gross income the rental value of a house furnished to them in 1968. 4. Whether petitioners are entitled to charitable contribution deductions for payments made to Denver Revival Tabernacle and Soldiers of the Cross in 1967. 5. Whether petitioners had additional income in 1968 by reason of the cancellation of petitioner Patty J. Cooper's loan by Denver Revival Tabernacle. 6. Whether petitioners are liable for the additions to tax under section 6653(a) for 1967 and 1968. FINDINGS OF FACT Petitioners resided in Lakewood, Colorado at the time they filed their petitions in these cases. During the years in issue, Donald S. Cooper ("Donald") served as president and *340 as a director of the Westland Industrial Bank of Lakewood, Colorado. He also served as a director of the Rocky Mountain Bank, of which his brother was president. Both banks were controlled by the Cooper family. The family held 80 percent of the stock in the Rocky Mountain Bank and it held voting control of the Westland Industrial Bank. During the years in issue Donald was also president and pastor of the Denver Revival Tabernacle ("Tabernacle"). In addition he was an ordained minister in Soldiers of the Cross ("Soldiers"). These two organizations maintained close ties and the president of Soldiers, Dr. Kenneth Goff, served as a director of Tabernacle. Donald had known Dr. Goff his entire life and had borrowed money from Soldiers. 1. Notes from Soldiers.
On January 10, 1955, Donald borrowed $25,000 from Soldiers. A note evidencing the loan was executed by Donald on September 1, 1965. The note was payable "on demand" and provided for 6 percent interest on the principal. On July 1, 1966, Donald repaid $3,000 on the note. Thereafter, on December 31, 1966, Donald borrowed $18,000 more from Soldiers, consolidated the two loans and executed a promissory note payable *341 to Soldiers in the amount of $40,000. This note was payable over a 10-year period and provided for 6 percent interest on the principal. On September 6, 1967, Donald executed a "Duplicate Note" in the amount of $20,115.91, payable to Soldiers. This note represents the indebtedness remaining on the $40,000 note, which note was lost. The principal indebtedness on the Duplicate Note was reduced to $13,383.15 on October 20, 1967. This note bore interest at 6 percent per annum and was payable at a rate of $250 per month with the balance due payable on February 2, 1969. 2. Parsonage Allowance.
During 1967 and 1968 Tabernacle owned a house and a church. Donald resided in the house rent free and counseled parishioners there on many occasions during 1968. The annual fair rental value of the house in 1968 was $3,120. 3. Cancellation of Indebtedness.
At Donald's request, the board of directors of Tabernacle transferred the church property to the Rocky Mountain Bank on December 24, 1968, in exchange for $273,915.43 of bank loans made to the Cooper family and organizations they controlled. The loans involved in the exchange were as follows: Rocky Mountain Bank Loan No.
Payor
Principal
Interest
8550
W.I.B.
$ 72,444.44
$ 0
8565
Motels Inc.
41,599.25
110.43
8738
Patty J. Cooper
31,000.00
439.99
8315
Paul E. Cooper
56,028.06
303.45
7066
D.R.T. Inc.
72,843.68
230.70
TOTALS
$273,915.43
$1,084.57
*342 The Patty J. Cooper loan was due in October, 1969. The transfer occurred following the issuance of a federal citation order by the Federal Deposit Insurance Corporation in August 1968 directing the Rocky Mountain Bank to correct violations of the banking laws and improper banking procedures and to obtain additional capitalization. Prior to the issuance of the federal citation order, the Banking Commission for the State of Colorado had been critical of the Rocky Mountain Bank's operation.This criticism was directed primarily towards the loans made to members of the Cooper family or organizations they controlled. In addition, in December 1968 the directors of the bank were negotiating for the sale of the bank. These two factors combined to place pressure on the Rocky Mountain Bank to remove the loans to Patty J. Cooper ("Patty") and to organizations controlled by petitioners. On December 10, 1968, the Chairman of the Board of Directors of the Rocky Mountain Bank wrote Donald a letter in which he stated: I have reluctantly come to a decision that I believe is in the best interests of The Rocky Mountain Bank, and the decision is that the Denver Revival Tabernacle, Inc. property *343 should and must be conveyed, free and clear of all liens and encumbrances, to The Rocky Mountain Bank in exchange for the above mentioned loans. Thereafter, on December 24, 1968, Tabernacle transferred its church property to the Rocky Mountain Bank in exchange for the Cooper family loans. As part of this transaction, Tabernacle obtained a six month option to repurchase the church property for $275,000. In October 1969, when Patty's loan was due, Donald substituted his personal note for his wife's note. At that time various stocks pledged as security for Patty's note were released. Donald's replacement note was secured by his Rocky Mountain Bank stock, which was also pledged as security on a loan at another bank. The value, if any, of the pledged stock was unclear because the Rocky Mountain Bank had been closed by the Banking Commission for the State of Colorado in January 1969 and was being liquidated by the Federal Deposit Insurance Corporation. 4. Purchase of Real Property by Patty.
Patty purchased a parcel of real property in Jefferson County, Colorado, on July 5, 1968, from SKB Investments ("SKB") for $26,708.78.As part of the sale, Patty assumed an existing *344 First Deed of Trust to Don F. Hoagland with a principal balance of $20,721.06. On December 31, 1968, the balance due on this obligation was $19,981.74. SKB had purchased the property from Mary Petterson in 1966 or early 1967. As part of that purchase, SKB had agreed in a "Receipt and Option" agreement dated February 25, 1966, to pay within 10 days Mary Petterson's loan of $2,263.71 from the Westland Industrial Bank. In addition, on January 19, 1967, when SKB obtained title insurance on the Jefferson County property, a Second Deed of Trust was still of record as an encumbrance against the property. The Second Deed of Trust was given by Mary Petterson to Robert W. Caddes on March 16, 1966. This deed of trust was given as security on a $2,565 loan which was due on September 16, 1966. Patty did not assume either of these loans when she purchased the property. 5. Donald's Loan to Motels, Inc.
During 1968 Donald loaned Motels, Inc. $3,500 cash.Motels, Inc. was owned by Donald's children and the children of his brother. 6. Charitable Contributions.
In 1967 Donald made contributions of $3,400 and $2,000, respectively, to Tabernacle and Soldiers. At the time Donald *345 made the contribution to Tabernacle, its tax exemption ruling had been revoked. Respondent had issued an announcement that contributions to Tabernacle were not deductible under section 170. [3] However, in 1967 Donald, on behalf of Tabernacle, was still asserting Tabernacle's exempt status. Thereafter, in mid-1968, following his father's death in June 1967, Donald abandoned his attempt to reinstate Tabernacle's exemption ruling. After discussing the problem with Dr. Goff of Soldiers, Donald decided that he could conduct Tabernacle's activities under Soldiers' tax exempt status. At the time in 1967 that Donald made his contribution to Soldiers, it was a tax exempt organization and contributions to it were deductible under section 170. However, on May 23, 1968, its tax exemption ruling was revoked retroactively to January 1, 1967, because since March 1967 it has refused to allow respondent to examine its books and records. On July 29, 1968, respondent announced that he did not consider contributions to Soldiers *346 to be deductible under section 170 for any year beginning after December 31, 1966. (1968-31 I.R.B. 94) 7. Respondent's Determination.
On their income tax returns for 1967 and 1968, petitioners reported adjusted gross income of $44,859.77 and $41,608.72 respectively. For 1967 petitioners claimed deductions for charitable contributions to Denver Revival Tabernacle and Soldiers of the Cross of $3,400 and $2,000, respectively.After examination of petitioners' income tax returns, respondent reconstructed their income using the source and application of funds method because of the absence of books and records and because of the large number of purchases by petitioners with cash and money orders. Respondent in his brief computed petitioners' understated adjusted gross income for 1967 and 1968 as follows: [4]
Source and Application of Funds Computation for 1967
Funds Applied
1. Increase in savings account
$3,581.41
Westland Industrial Bank - Bal. 12-31-67
534.05
$3,047.36
Bal. 1-1-67
2. Capital assets purchased
1965 Cadillac
$3,800.00
1968 Dodge Charger
3,045.00
6,845.00
3. Decrease in loans payable
Balance
1-1-67
12-31-67
American National Bank
$271,700.00
$255,468.41
Taxpayer's 1/2 interest
$135,850.00
$127,734.21
Soldiers of the Cross
40,000.00
13,383.15
Denver U.S. Bank
0
3,500.10
$175,850.00
$144,617.46
31,232.54
4. Unallowable capital loss carryover to 1968
($1,000.00 claimed and allowed in 1967) [5]
1,800.00
5. Personal living expenses
Source - Annual budget costs
Department of Labor
10,275.65
6. Other personal expenses
a) Interest paid
American National Bank
$15,500.71
Taxpayer's 1/2
interest
$ 7,750.36
GMAC
211.45
J. W. Jessup
600.00
11,415.13
Rocky Mountain Bank
2,853.32
Sub Totals Forwarded
11,415.13
$53,200.55
b) Contributions - per return
5,400.00
c) Miscellaneous deductions - per return
210.05
d) Taxes - per return
$1,500.27
Less sales tax included
in item 5 above
238.00
$1,262.27
Federal income tax withheld
2,136.65
Federal income tax estimated
Per return
$3,200.00
4th Qr. 1966 paid
in 1967
1,000.00
Paid by 1966
carryover
(946.19)
4th Qr. 1967 paid
in 1968
(800.00) 2,453.81
FICA (4.4 0/0 X 6,600 + $290.40)
580.80
6,433.53
e) Insurance payments
Consumers National Life
$ 647.80
Great Commonwealth Life
1,983.00
American General Life
408.00
3,038.80
f) Gifts to Ronald Cooper (son)
1,496.90
g) Money orders purchased for personal
items not included elsewhere: [6]
4-5-67 Architect Expense
$170.00
5-1-67 Legal Expense
500.00
5-16-67 Gift to J. Jessup
360.00
5-18-67 Country Club expense
162.87
6-29-67 Gift to H. Bagwell
500.00
10-2-67 Gift to H. Bagwell
150.00
12-31-67 Political Gift
100.00
1,942.87
29,937.28
Total Funds Applied
$83,137.83
Sources of Funds
1.Cash on hand on 1-1-67
$18,000.00
2. Decrease in checking account at
Rocky Mountain Bank
Balance 1-1-67 per bank statement
$2,104.37
Outstanding check #745, 12-31-66
(362.27)
Revised Balance
$1,742.10
Balance 12-31-67 per bank statement
25.20
Total decrease
$1,716.90
Taxpayer's 1/2 interest
$ 858.45
3. Adjusted gross income per return
44,859.77
4. Dividend Exclusion
100.00
Total Source of Funds
$63,818.22
Total Funds Applied
$83,137.83
Total Source of Funds
63,818.22
Adjusted Gross Income Understated
$19,319.61
*347 Source and Application of Funds Computation for 1968
Funds Applied
1. Increase in checking account
Rocky Mountain Bank - Balance 12-31-68
$28.18
Balance 1-1-68
25.20
Total increase
2.98
Taxpayer's 1/2 interest
$ 1.49
2. Capital assets purchased
Furniture
$ 210.00
Real estate - 11191 W. Colfax Ave.
26,708.78
26,918.78
3. Increase - Loans Receivable
Loan to Motels, Inc.
3,500.00
4. Personal living expenses
Source - Annual budget costs
Department of Labor
10,497.67
5. Other personal expenses
a) Interest paid
American National Bank
$15,437.07
Southwest State Bank
400.00
Taxpayer's 1/2 interest
$ 7,918.53
Rocky Mountain Bank
2,589.81
Denver U.S. Bank
300.00
Internal Revenue Service
3,126.50
Mortgage Payable (Mrs. Haagland)
615.01
14,549.85
b) Unallowable contributions paid
by money orders
4,807.94
c) Taxes - per return
$ 1,235.02
Less: Sales tax included in
item 4 above
662.17
$ 572.85
Federal income tax withheld
3,110.81
Federal income tax estimated: per return
$ 2,800.00
4th Qr. 1968 paid 1969
(700.00)
4th Qr. 1967 paid 1968
800.00
2,900.00
Sub Totals Forwarded
$6,583.66
$60,275.73
Tax assessment paid by
money order #1375 10-4-68
7,000.00
FICA (4.4 0/0 X $7,800=$343.20 + $299.20)
642.40
State income estimated: money order
$200.00
money order
312.02
money order
200.00
money order
200.00
912.02
d) Insurance payments
Consumers National Life
$ 647.80
Great Commonwealth
1,983.00
American General Life
408.00
D.A. Near Agency
139.00
3,177.80
e) Miscellaneous deduction - per return
25.00
f) Settlement of civil suit #21910
1,000.00
g) Money orders purchased for personal
items not included elsewhere: [7]
2-8-68 Legal Fees
$225.00
2-21-68 Legal Fees
165.50
11-26-68 Legal Fees
250.00
1-10-68 Gift to Lonnie Salazar
100.00
9-18-68 Gift to Lester Crowley
500.00
12-17-68 Gift to Paul Cooper
100.00
1-2-68 Personal Payment
38.60
1-17-68 Personal Payment
18.40
5-8-68 Personal Payment
51.90
12-17-68 Personal Payment
5.00
10-21-68 Personal Payment
185.00
1-18-68 Personal Payment
77.66
3-7-68 Personal Payment
10.00
3-8-68 Personal Payment
130.17
5-8-68 Personal Payment
21.00
9-3-68 Personal Payment
2.00
10-11-68 Personal Payment
19.97
12-5-68 Personal Payment
17.51
12-11-68 Personal Payment
5.75
1-19-68 TV Service
24.95
9-4-68 Veterinary Service
5.50
12-4-68 Veterinary Service
24.00
12-31-68 County Clerk
48.42
12-31-68 County Clerk
30.69
2,057.02
21,397.90
Total Funds Applied
$81,673.63
Sources of Funds
1. Increase in loans payable
Balance
1-1-68
12-31-68
American National Bank
$255,468.41
$252,848.44
1st Westland Bank
0
7,000.00
Southwest State Bank
0
15,000.00
Taxpayer's 1/2 interest
$127,734.20
$137,424.22
Rocky Mountain Bank
41,906.68
Rocky Mountain Bank
0
31,000.00
Denver U.S. Bank
3,500.10
0
Metropolitan Bank
0
7,000.00
Mortgage Payable (Mrs. Haagland)
0
19,981.74
$173,140.98
$195,405.96
$22,264.98
2. Decrease in savings account
Westland Industrial Bank
Bal. 1-1-68
$3,581.41
Bal. 12-31-68
14.63
3,566.78
3. Capital loss carryforward from 1967 return [8]
1,800.00
4. Dividend exclusion
148.00
5. Adjusted gross income per 1968 return
41,608.72
Total Source of Funds
$69,388.48
Total Funds Applied
$81,673.63
Total Source of Funds
69,388.48
Adjusted Gross Income Understated
$12,285.15
*348 Respondent also disallowed petitioners' claimed charitable deduction in its entirety, and determined that petitioners had additional income by reason of the rent-free use of a house in 1968 and by reason of the cancellation of a loan in 1968. In addition, respondent determined that petitioners were liable for additions to tax under section 6653(a) for 1967 and 1968. OPINION I. Understatement of Income for 1967 and 1968.
The first issue for decision is whether respondent erred in his determination that petitioners understated their gross income in 1967 and 1968. During the audit of petitioners' 1967 and 1968 income tax returns, petitioners failed to furnish any books and records with which respondent could verify the correctness of the income reported on these returns. As a result, respondent reconstructed their income using the source and application of funds method, and determined that petitioners had understated their adjusted gross income during 1967 and 1968. Under this reconstruction of income method, it is assumed that the amount by which a taxpayer's application of funds during a taxable period exceeds *349 his reported source of funds for the period is tasable income, absent a showing by the taxpayer of a non-taxable source. See Taglianetti v. United States,398 F. 2d 558, 562-563 (1st Cir. 1968). Respondent's determination under this method is presumptively correct, and petitioners bear the burden of overcoming this presumption. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Rules of Practice and Procedure.
A. Note from Soldiers.
With respect to 1967, petitioners make only one objection to respondent's calculations. They assert that respondent erred in his determination that in 1967 they repaid $26,616.85 on a debt owing to Soldiers of the Cross ("Soldier") and, as a consequence, he erred in including $26,616.85 in his calculation of their application of funds. We have found that Donald S. Cooper ("Donald") borrowed $25,000 from Soldiers on January 10, 1955 and repaid $3,000 of the loan on July 1, 1966. Thereafter, on December 31, 1966, Donald borrowed $18,000 from Soldiers, concolidated the two loans and executed a promissory note for $40,000.On September 6, 1967, Donald executed a "Duplicated Note" in the amount of $20,115.91, *350 payable to Soldiers. Subsequently the principal indebtedness on the "Duplicate Note" was reduced to $13,383.15 on October 20, 1967. Petitioners contend that the $40,000 note and the "Duplicate Note" for $20,115.91 are, in fact, two separate notes and that during 1967 they did not discharge any portion of the principal on either note. At the hearing in this case the current president of Soldiers testified that the only notes executed by Donald and Patty Cooper in his possession were the original $25,000 note and the "Duplicate note." He further testified that he was unable to locate the original of the $40,000 note in Soldiers' records. These facts dictate a conclusion that the "Duplicate Note" was executed as a replacement for the lost $40,000 note. In support of their contention that the notes do not represent the same indebtedness, petitioners rely upon the testimony of the president of Soldiers that the original $25,000 note and the "Duplicate Note" were still due and payable. However, this testimony fails to support petitioners' contentions. The $25,000 note was cancelled on December 31, 1966, when that loan was consolidated with the $18,000 loan. Apparently when Soldiers' *351 president testified that both notes were still due, he was unaware that the $25,000 note had been cancelled. Petitioners also assert that the fact that the terms and conditions of the original $25,000 note differ from the terms and conditions of the "Duplicate Note" supports their conclusion that the "Duplicate Note" represents a separate indebtedness from the $40,000 note. We find their reliance on this fact totally misplaced; as part of the consolidation of the original $25,000 loan with the $18,000 December 31, 1966 loan, a new note for $40,000 was executed and the terms and conditions of the $40,000 note and the "Duplicate Note" are substantially the same. In light of these facts we conclude that the "Duplicate Note" and the $40,000 note represent the same indebtedness and that the principal balance on this indebtedness was reduced to $13,313.15 during 1967. [9] As a consequence of this conclusion, we hold that respondent did not err in including $26,616.85 in his calculation of petitioners' application of funds. *352 With respect to 1968, petitioners assert that respondent erred in failing to include various items in his calculation of their source of funds and in including a note from Motels, Inc. to Donald in the calculation of their application of funds. B. Purchase of Real Property by Patty.
The first purported error in 1968 centers around the purchase by Patty J. Cooper ("Patty") of a parcel of real property in Jefferson County, Colorado, on July 5, 1968, from SKB Investments ("SKB"). The sale price on the property was $26,708.78; as part of the sale, Patty assumed an existing First Deed of Trust to Don Hoagland with a principal balance of $20,721.06. On December 31, 1968, the principal balance on this First Deed of Trust was $19,811.74. In his reconstruction of petitioners' income for 1968, respondent treated the purchase price as an application of funds and treated the year end principal balance on the First Deed of Trust as a source of funds. Petitioners contend that, in addition to the First Deed of Trust, two additional obligations were assumed by Patty as part of the sale and that at the end of 1968 the remaining principal balance on these obligations was $6,727.04. They *353 argue that these obligations should also be included in respondent's calculations of their source of funds from 1968. We disagree. The first of the two obligations petitioners assert Patty assumed was a Second Deed of Trust for $2,565 from Mary E. Petterson to Robert W. Caddes dated March 16, 1966. The principal amount of this obligation was due on September 16, 1966. However, as of January 19, 1967, the Second Deed of Trust was still of record as a lien against the real property. But in the deed conveying the property from SKB to Patty the only lien against the property assumed by Patty was the First Deed of Trust to Don Hoagland. In light of these facts we conclude that respondent did not err in failing to include the amount of the second deed of trust in his calculations of petitioners' source of funds for 1968. The second obligation petitioners assert Patty assumed upon acquisition of the real property was a debt for $2,263.21 payable to Westland Industrial Bank. Petitioners assert that this obligation had been assumed by SKB when it acquired the property in 1966. They further assert that Patty assumed the obligation on July 5, 1968, when she acquired the property *354 from SKB. However, in a "Receipt and Option" dated February 25, 1966, executed between SKB and Mary Petterson for the purchase of the property, it was specifically provided that the obligation of Mary Petterson to Westland Industrial Bank was to be paid by SKB within 10 days. In view of this fact and petitioners' failure to present any credible evidence that the obligation was still in existence on July 5, 1968, or that Patty in fact assumed the obligation, we conclude that respondent did not err in failing to include the amount of the obligation in his calculation of petitioners' sources of funds for 1968. C. Sale of Stock.
Petitioners' next contention with respect to respondent's reconstruction of their income for 1968 is that he erred in failing to include in his computation of their source of funds monies received from the sale of various stocks. [10] We disagree. Petitioners have misconstrued the theory and mechanics of the source and application of funds method of reconstruction of income. Under this method the amount by which a taxpayer's application of funds exceeds his reported source of funds for the period is assumed to be taxable income absent a showing *355 of a non-taxable source such as a loan or gift. Here, in the absence of any showing (or reporting) of basis, the receipts from the sale of the stock bear the appearance of unreported income rather than reported income or monies received from a non-taxable source. Thus petitioners are incorrect in asserting that these monies should have been included in respondent's calculation of their source of funds. [11]
*356 D.Donald's Loan to Motels, Inc.
Petitioners also assert that respondent erred in including a $3,500 note in his computations of their application of funds for 1968. They assert that the note was received by Donald in 1968 in compensation for services Donald rendered to Motels, Inc. As a result, petitioners contend, the note does not represent an application of funds in 1968. Respondent, on the other hand, asserts that the note reflects cash advances made by Donald to Motels, Inc. We agree with respondent. Petitioners have presented no credible evidence to support their assertion that the note represents compensation for services. On the contrary, the evidence supports respondent's assertion. On its 1968 income tax return Motels, Inc. listed compensation paid to Donald as "none." In addition, Motels, Inc.'s books and records for 1968 reflect an increase of $3,500 in its note payable to Donald. This entry refers to the cash journal indicating that it received cash when it incurred this liability. If, as petitioners assert, the note represented compensation for services, the posting reference would have been to an expense account and not to the cash journal. In view *357 of these facts we conclude that respondent did not err in including in his computation of petitioners' application of funds the $3,500 note payable from Motels, Inc. to Donald. II. Parsonage Allowance. The second issue for decision is whether petitioners are entitled to exclude from their 1968 gross income the rental value of the residence furnished them by the Denver Revival Tabernacle ("Tabernacle") under section 107. Section 107(a)(1) generally permits a minister of the gospel to exclude from his gross income the rental value of a home furnished to him as part of his compensation. However, in order to qualify for the exclusion the home must be provided as remuneration for services which ordinarily are the duties of a minister of the gospel. Sec. 1.107-1(a), Income Tax Regs.
Petitioners assert that Donald was furnished a home as part of his compensation as pastor of Tabernacle and that Donald performed the usual pastoral duties for Tabernacle. Respondent, on the other hand, asserts, first, that petitioners have failed to present any evidence to substantiate their assertions. Although the evidence presented is meager at best, we are convinced that during 1968 Donald, *358 who was an ordained minister, and pastor, president and a director of Tabernacle, was furnished a home as part of his compensation for services which ordinarily are the duties of a minister of the gospel. Respondent also asserts that petitioners have failed to establish that Tabernacle was either in existence or operated as a church during 1968. In support of this assertion, respondent relies on the fact that after Tabernacle's tax exemption ruling was revoked in 1963, it transferred its operation to Soliders, and the fact that Tabernacle's church property was transferred to the Rocky Mountain Bank on December 24, 1968. We are of the opinion that respondent's reliance is misplaced. The church property was not transferred until the last week of 1968 and Tabernacle retained a six-month option to repurchase the property. In addition, although Tabernacle's tax exemption ruling was revoked in 1963, Donald continued to counsel parishioners during 1968. Moreover, contrary to respondent's assertion, Tabernacle's operations were not transferred to Soliders, but rather, Tabernacle decided to conduct its activities under Soliders' tax exemption ruling in mid-1968. In light of these *359 circumstances, we conclude that Tabernacle was in existence and operated as a church during 1968 for purposes of section 107. Accordingly, petitioners are entitled to exclude from their 1968 income the rental value of the house furnished them by Tabernacle under section 107. III. Charitable Contributions. The third issue for decision is whether petitioners are entitled to a deduction under section 170 for contributions made to Tabernacle and Soldiers in 1967. Section 170(a) allows deductions for charitable contributions. A "charitable contribution" is defined in section 170(c) to mean a contribution to or for the use of an exempt organization, in this case presumably one organized and operated exclusively for religious purposes no part of the earnings of which inures to the benefit of any private shareholder or individual. Petitioners, who have the burden of proof (Rule 142(a), Tax Court Rules of Practice and Procedure), presented no evidence describing the activities and operations of Tabernacle or Soldiers. Therefore, petitioners are not entitled to the charitable contributions deductions claimed on their 1967 income tax return unless they are entitled to rely on exemption *360 rulings previously issued to those organizations. Respondent has for many years published a list of organizations to which contributions are concededly deductible under section 170. Each organization listed in the publication has received a ruling or determination letter to that effect. In Rev. Proc. 64-25, 1964-1 (Part 1) C.B. 694, [12] respondent announced his position as to the deductibility of contributions to organizations whose ruling or determination letter has been revoked. He stated that contributions to such organization will be allowed without regard to the status of the organization if made prior to the date of publication of an announcement in the Internal Revenue Bulletin that the exemption ruling has been revoked. However, respondent also provided in that Revenue Procedure that the above general rule will not apply where: * * * the contributor, *361 prior to the publication of such announcement, (1) had knowledge of the new ruling or determination letter, (2) was aware that its issuance was imminent, or (3) was in part responsible for the activities or deficiences which gave rise to its issuance. Petitioners claim to fall within the class of donors described in the general provision of Rev. Proc. 64-25. With respect to petitioners' contributions to Tabernacle, it is apparent that petitioners' contributions were made after respondent revoked its exemption ruling. The tax exemption ruling of Tabernacle was revoked on May 9, 1963, and in 1963-25 I.R.B. 24, respondent announced that fact. With respect to contributions made to Soldiers, the exemption ruling was revoked on May 23, 1968, and in 1968-31 I.R.B. 94 that revocation was announced. Petitioners argue that since the revocation did not occur until mid-1968, they are entitled to a deduction for the 1967 contribution under Rev. Proc. 64-25. Respondent, on the other hand, contends that "Donald is precisely the type of donor who was intended to be excluded from the benefit of Rev. Proc. [64-25]." Respondent raises two *362 arguments in support of his contention. He argues, first, that since Donald switched Tabernacle's operation to Soldiers in 1967 or 1968, following the loss of its tax exemption ruling, Donald had to know that the expanded activity of Soldiers would not satisfy the requirement of section 170(a) and 501(c)(3). In support of this argument, respondent apparently relies on the second and third exclusions found in Rev. Proc. 64-25. The former exclusion provides that no deduction will be allowed where the contributor was aware that the revocation was imminent, and the latter denies the deduction where the contributor was in part responsible for the activities which gave rise to the issuance of the revocation. We are of the opinion that respondent's reliance on these provisions is misplaced. Contrary to respondent's assertion, it was not the expanded activities of Soliders which resulted in the revocation. Rather, it was Soldiers' failure to allow respondent to inspect its books and records which gave rise to the revocation. We therefore conclude that petitioners' participation in expanding Soldiers' activities is irrelevant in determining whether petitioners fall within the *363 general or exclusionary provision of Rev. Proc. 64-25. In addition, expansion of Soldiers' activities occurred following the death of Donald's father in June 1967, while the failure of Soldiers to allow respondent to inspect its books and records arose in March of 1967. Respondent next argues that Donald's close relationship with Soldiers makes it unrealistic to assume that he was not aware that Soldiers' tax exemption ruling would be revoked. We disagree. Though Donald had a close relationship with Soldiers and its President, Dr. Goff, we are unwilling to infer from this fact alone that he knew of Soldiers' day to day activities or of its refusal to allow respondent to inspect its books and records. In light of these circumstances, we conclude that petitioners fall within the general provisions of Rev. Proc. 64-25 with respect to Soldiers and are therefore entitled to deduct their contributions to Soldiers. IV. Cancellation of Indebtedness Income. The next issue is whether in 1968 petitioners realized income as a result of cancellation of a $31,000 loan Rocky Mountain Bank made to Patty. On December 24, 1968, the Rocky Mountain Bank *364 exchanged over $273,000 of loans outstanding to the Coopers or organizations they controlled for real property owned by Tabernacle.Included in these loans was Patty's loan for $31,000. Respondent asserts that Patty's loan was cancelled the moment it was transferred to the Tabernacle and as a result petitioners realized income of $31,000 under section 61(a)(12). [13] Petitioners, on the other hand, assert that Patty's obligation was still due and outstanding on December 31, 1968, and we agree. Respondent's contention is based upon the fact that Donald controlled Tabernacle and upon respondent's belief that Donald would not have sought repayment from his wife. In support of this contention, respondent points to the financial difficulties Donald was undergoing in late 1968 and subsequent events which resulted in the substitution of Donald's note for Patty's note. We are of the opinion that respondent's *365 argument falls of its own weight. If a cancellation of Patty's obligation in fact occurred, it would have been in 1969 when Donald substituted his own note for Patty's note. At that point the security held by the Tabernacle on the loan was released and Patty was free to dispose of those assets as she chose. Moreover, Patty's obligation was not due until October 1969; thus, at the time of the acquisition of the note by Tabernacle the note was not yet due. Finally, although Tabernacle had transferred its church property to the Rocky Mountain Bank in exchange for this note and other notes, it had retained an option to repurchase the property within six months for $275,000. Had Tabernacle at the time it transferred its church property to the bank already decided to forfeit its church property and cancel Patty's loan, it would not have acquired the option to repurchase the property. In light of these facts, we conclude that the substitution of Tabernacle for the Rocky Mountain Bank as Patty's creditor did not constitute a cancellation of the loan and, furthermore, that the loan was not cancelled in 1968. V. Negligence Penalty. The final issue is whether petitioners are *366 liable for additions to tax under section 6653(a) for negligent underpayment of taxes for 1967 and 1968. Section 6653(a) provides for an addition to the tax of five percent of the "underpayment" where any part of such underpayment is due to negligence or intentional disregard of the rules and regulations of the Internal Revenue Code. Petitioners, on whom the burden of proof rests ( Bixby v. Commissioner,58 T.C. 757, 791 (1972)), offered no evidence on this issue, but argue that because all their books and records were in the hands of the Federal Deposit Insurance Corporation ("FDIC"), any underpayment of taxes could not have been the result of negligence or intentional disregard of the rules and regulations. We disagree. Contrary to their assertion, the only records of petitioners' which were held by the FDIC were those relating to the $31,000 Patty Cooper loan. Thus their understatement of income in 1967 and 1968 as determined in respondent's reconstruction cannot be justified by FDIC's possession of their records. In view of these facts and in light of their failure to present any evidence on this issue, we hold that petitioners are liable for additions to *367 tax under section 6653(a) for 1967 and 1968. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Petitioners apparently concede this issue since they did not argue on brief that they are entitled to a deduction for interest in excess of $2,853.32 in 1967. In addition, the evidence presented makes it clear that a third party and not petitioners paid the disputed interest payments. We therefore conclude that petitioners are not entitled to an interest deduction for 1967 in excess of $2,853.32.↩
3. The tax exemption ruling of Tabernacle had been revoked on May 9, 1963 and respondent issued his announcement on June 24, 1963 in 1963-25 I.R.B. 24↩.
4. With the exceptions noted within the opinion, petitioners do not contest any of the items in respondent's computations. ↩
5. By stipulation, the parties have explained that this item represents the excess of a $2,800 loss on a note of which petitioner was co-signer over the $1,000 deduction allowed on the loss in 1967. ↩
6. These expenditures reflect personal living expenses which exceeded the allocable amounts for various items under the Department of Labor annual budget costs.↩
7. See note 6 supra↩.
8. See footnote 5 supra↩.
9. We found, contrary to petitioners' assertion that they did not repay the principal on any notes payable to Soldiers, that the principal balance on the "Duplicate Note" was reduced from $20,115.91 to $13,383.15 on October 20, 1967. We relied on Dr. Goff's endorsement on the back of the note which stated: "Balance as of 10-20-1967 is $13,383.15 approved by Kenneth Goff."↩
10. Petitioners assert that $7,957.50 from the sale of 100 shares of Sunbeam Corp. stock and $5,538.99 from the sale of 100 shares of Ashland Oil and Refining Co. stock should have been included in their source of funds. Their computation of the amount received on the sale of the Ashland stock was apparently arrived at by totalling the payments made on the note from Patty Cooper to the Rocky Mountain Bank during March and April of 1968. However, since the stocks were not sold until on or about April 16, 1968, only the $3,756.92 payment on the note after the sale could have been made from the proceeds of the stock sale. ↩
11. The portion of the monies received from the sale of stock which constituted a return of capital to petitioners falls within monies received from non-taxable sources. However, because petitioners have failed to present any evidence as to their basis in the stock, we are compelled to conclude that the entire proceeds constitute unreported income.↩
12. Rev. Proc. 64-25 was withdrawn and superseded by Rev. Proc. 68-17, 1968-1 C.B. 808. Rev. Proc. 68-17 was subsequently withdrawn and supperseded by Rev. Proc. 72-39, 1972-2 C.B. 819↩. There are no material differences in any of the revenue procedures.
13. Section 61(a)(12) provides: (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (12) Income from discharge of indebtedness; * * *↩